THE STATE *ex rel.* CITY OF ST. LOUIS v. SEIBERT, *State Auditor.*

In Banc, June 25, 1894.

**Constitution:** ST. LOUIS INSANE ASYLUM: APPROPRIATION. An appropriation for the support of the indigent insane in the insane asylum of the city of St. Louis who belong to the state outside of the city, is not unconstitutional, though such insane asylum is a private institution of such city, and is not one of the state eleemosynary institutions. (SHERWOOD, GANTT and BURGESS, JJ., *dissenting*).

*Mandamus.*

PEREMPTORY WRIT AWARDED.

*W. C. Marshall* for relator.

(1) The appropriation in the form in which it was made was a legislative determination that the appropriation was necessary; that there were insane persons in the St. Louis insane asylum who belonged to the state outside of the city of St. Louis, and for whose support it was proper for the state to provide. The legislature did not appropriate money for the support of the St. Louis insane asylum. As the appropriation was not for the support of the insane asylum, section 46, article 4, of the constitution has no application. The appropriation vetoed by Governor Phelps

purported to be to the St. Louis insane asylum. (2) Inasmuch as St. Louis has an asylum of its own, it is required by section 518, Revised Statutes, 1889, to bring back all its own indigent insane in any of the asylums of the state, and to keep all of its own insane hereafter. Taking this section into connection with the appropriation in this case, it is clear that the general assembly did not intend that any of the money thus appropriated should be used for the support of any of the indigent insane who belong to the city. But that the general assembly intended only to provide for such indigent insane, in the St. Louis asylum, as do not · belong to the city, and have no more claim upon the city than they have upon any other county in the state. The general assembly determined, as it had a right to determine, under section 43 of article 4, that there were such persons in the St. Louis insane asylum, and that they were public wards, and should be supported out of general revenue, because, mani-' festly, from their condition, it could not be ascertained to what locality they belonged and ought to be sent.

*R. F. Walker*, Attorney General, for the state.

(1) The taxing power may be exercised by the general assembly for "state purposes." Sec. 1, art. 10, Const. Mo. Taxes may be levied and collected for "public purposes only." Sec. 3, art. 10, Const. Mo. (2) An appropriation made by the general assembly is simply a statutory declaration as to the manner in which money raised by taxation is to be expended. See "Appropriation," Century Dictionary, and Winfield's Adjudged Words and Phrases; *Ristine v. State*, 20 Ind. 338; *Curtis, Adm'r, v. Whipple*, 24 Wis. 350. (3) The state constitution directs the manner in which all moneys collected by taxation shall be

expended or appropriated. Sec. 43, art. 4, Const. Mo. These directions clearly define appropriations to "state" or "public purposes." See subdivisions 1, 2, 3, 4, 5, 6 and 7, sec. 43, art. 4, Const. Mo. The words "and such other purposes not herein prohibited, as it may deem necessary," to be found in subdivision 7, *supra*, are, under the maxim *expressio unius exclusio alterius*, and the familiar rule of statutory construction, limited in their meaning and operation to the particular words preceding them. *State v. Bryant*, 90 Mo. 534. The same rules of construction apply to constitutions as to statutes. *State ex rel. v. Macon County Court*, 41 Mo. 453. (4) The St. Louis insane asylum is not one of the eleemosynary institutions of the state. R. S. 1889, sec. 5671. The general assembly is, therefore, not authorized under section 43, article 4, *supra*, to appropriate money for its support. The "St. Louis insane asylum" is one of the institutions belonging to, under the control of, and to be supported by, that municipality. Sec. 26, subdiv. 13, Charter of St. Louis, p. 2100; R. S. 1889. An appropriation "for the support of the indigent insane in the insane asylum of the city of St. Louis who belong to the state outside of the city of St. Louis" is nothing more than a grant of aid to such institution; and a grant of aid to such institution is simply a grant of aid to the municipality to which the institution belongs. An appropriation of this nature is expressly prohibited by the present constitution—section 46 of article 4. (6) The attempt to legalize the appropriation by stating that it is for the support of the indigent insane in said asylum, "who belong to the state outside of the city of St. Louis," is mere persuasive phrasing employed by the draughtsman of the bill to facilitate its passage, and adds nothing to its force or legal effect. "The indigent insane of the state outside of the city of St. Louis" are either

supported in the insane wards of the poorhouses of the counties to which they belong, or in one of the state asylums at the expense of such counties. R. S. 1889, arts. 1 and 2, chap. 9; *State ex rel. v. Cole Co.*, 80 Mo. 80. (7) The state of Missouri could not, by an act of its general assembly, have authorized the levy of a tax to create a fund for the support of the St. Louis insane asylum. Secs. 46 and 53, art. 4, Const. Mo.; *Loan Association v. Topeka*, 20 Wall. 653; *Truett v. Justices*, 20 Ga. 102. It follows, then, that it could not appropriate money for one purpose which had been levied and collected for another. *Loan Association v. Topeka*, *supra; St. Mary's Indus. School v. Brown*, 45 Md. 310; *State v. Haben*, 22 Wis. 660. (8) Taxes which have been levied and collected for "state purposes" have, in some instances, been appropriated for purposes purely charitable, because such purposes are in some sense public; but wherever this has been done it will be found, if the matter has been tested in the courts, that such appropriations were not, as in Missouri, expressly prohibited by the organic law. *Fox v. Philadelphia*, 64 Pa. St. 182. (9) There is no force in the argument that this appropriation should be sustained because former general assemblies have made similar grants of aid. An unconstitutional law will be treated by the courts as null and void. *Board of Liquidation v. McComb*, 92 U. S. 531.

MACFARLANE, J.—Upon the petition of the city of St. Louis an alternative writ of *mandamus* was issued against respondent, as state auditor, requiring him to show cause why he should not draw warrants "in favor of the city of St. Louis for the sum of $2,083.33 for the month of January, 1893, pursuant to the provisions of the act of the general assembly of Missouri, approved April 1, 1893, and similar warrants for the same amount

for each of the months of February, March, April, May, June and July, 1893."

To this writ a general demurrer has been interposed. Under this demurrer it is claimed that section 8, of the act of the legislature approved April 1, 1893, referred to in said writ, is invalid, unconstitutional and void, and this presents the question for decision.

Section 8 is contained in an act, entitled "An act to appropriate money for the support of the eleemosynary institutions of the state, and of the indigent insane in the asylum at St. Louis, for the years of 1893 and 1894," and is as follows:

"Sec. 8.    For the support of the indigent insane in the insane asylum of the city of St. Louis, who belong to the state outside of the city of St. Louis, fifty thousand dollars ($50,000), which sum shall be paid upon the requisition of the treasurer, indorsed by the mayor of the city of St. Louis and approved by the governor, in equal monthly installments."

Respondent argues that this section is in conflict with section 46, article 4, of the constitution, which provides, that:

"The General Assembly shall have no power to make any grant * * * of public money or thing of value to any individual, association of individuals, municipal or other corporation whatsoever: Provided, that this shall not be so construed as to prevent the grant of aid in a case of public calamity."

On the other hand, relator argues that power to make the appropriation is found under section 43, of article 4. Paragraph sixth of said section authorizes the legislature to appropriate money: "For the support of the eleemosynary institutions of the state;" and paragraph seventh; "For the pay of the general assembly and such other purposes, not herein prohibited, as it may deem necessary."

It is undisputed that the insane asylum of the city of St. Louis is a private institution belonging to and controled by the city of St. Louis, and is not included under the general statutes as one of the eleemosynary institutions of the state. Scheme & Charter, sec. 9, R. S. 1889, p. 2078; sec. 5671, R. S. 1889.

It may be stated as a generally accepted principle of law that the legislature with all its plenary powers, regardless of constitutional restrictions and limitations, has no power to raise money by taxation, or appropriate it for purely private purposes; but to insure against an an attempt to do so, the constitution in express and positive terms, deprives it of such power by section 46, *supra*. *Loan Association v. Topeka*, 20 Wall. 658. If the appropriation complained of had been made for the support of the insane asylum of St. Louis, there could be no doubt of its unconstitutionality.

That the support of the indigent insane is an object universally recognized as a charity, can not be questioned. That public money may be applied to the support of that class of unfortunate citizens, is recognized in the liberal support given our public institutions for the insane, as well as by the constitution itself.

It may well be said here that the determination of the question, whether indigent insane belonging to the state outside of the city of St. Louis were supported by the St. Louis insane asylum, belonged to the legislature itself, and on that question we are concluded by its action.

It is said by Judge COOLEY: "The legislature is to make laws for the pulic good, and not for the benefit of individuals. It has control of the public moneys and should provide for disbursing them only for public purposes. Taxes should only be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes,

and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is invested with a large discretion which can not be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful. Where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the constitution imposes,—not those implied restrictions, resting in theory only, the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives." Cooley on Const. Lim., 153.

The constitution provides that appropriations may be made for "such other purposes, not herein prohibited as it may deem necessary." Subdivision seven, sec. 43, *supra*. This general clause follows a number of specific purposes for which appropriations are expressly authorized. It is contended by the respondent that under the familiar rule of statutory construction the general clause is limited in its meaning and operation to the particular clauses preceding it. Though we should adopt that rule of construction, we still think the general powers expressly conferred upon the legislature, and those inherently residing in it, would authorize appropriations for legitimate purposes. The right to approprite money to a public purpose follows legitimately from the right to tax for the same purpose. The taxing power of the general assembly is only limited, in its objects, to public purposes. If the power to appropriate the money raised by taxation be not prohibited in express terms, or by fair implication, it must be held to exist. And so we think the constitution should be read. Cooley's Const. Lim., *supra*.

But the rule of construction contended for would

clearly include the purpose for which this appropriation
was made.   That rule requires the general words to be
treated as referring to matters *ejusdem generis* with
such class first mentioned.   One class mentioned was
"for the support of the eleemosynary institutions of the
state" in some of which the indigent insane of the state
are supported.   The support of the insane of the state
is the purpose of this appropriation.   Broom's Legal
Maxims, 625; *State v. Bryant,* 90 Mo. 534.

The insane of the state being proper objects of
charity, some of the insane of the state outside the city
of St. Louis being supported by the St. Louis insane
asylum, the constitution authorizing an appropriation
for their support, unless prohibited expressly or by
reasonable implication, the question is, whether there
is such prohibition.

The words of the constitution do not contain a
prohibition.   Its language is: "The general assembly
shall have no power to make any grant, or to authorize
the making of any grant of public money or thing of
value to any individual, association of individuals,
municipal or other corporation whatever."   The
appropriation is for the "indigent insane of the state
outside the city of St. Louis," and not for the institu-
tion.   There is no prohibition here unless the state has
no power to dispense its public charity through the
agency of a private institution.

There is no constitutional inhibition against it
doing so.   It is true the charitable institutions of the
state are named under the statute (sec. 5671).   That
fact furnishes no ground against its use for the insane
of the state who may wander into the city of St. Louis.
There is no provision that all charity shall be dis-
pensed through the state institutions.   Most thorough-
fares of the state end in St. Louis, and numbers of the
insane from other parts of the state necessarily find

their way there. Shall these unfortunates be cared for, at the expense of the state, or turned into the streets to live or die as they may?

But a private corporation or individual may be the recipient of the funds of taxation, provided that the use be a public one. *St. John's College v. State*, 15 Md. 375; *Spear v. Blairsville*, 50 Pa. St. 150; *Sharpless v. Mayor*, 21 Pa. St. 169.

In the case last cited, the distinguished jurist and statesman, Judge JEREMIAH BLACK, says: "But the right to tax depends on the ultimate use, purpose and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers; and the people may be taxed for a public work, though it be under the direction of an individual or private corporation."

So it is held that a municipal corporation may be a trustee under the 'grant or will of an individual or private corporation but only, as it seems, for public purposes, germane to its objects. *Philadelphia v. Fox*, 64 Pa. St. 181 and cases cited.

It was held by the court of appeals of Maryland that the city of Baltimore could, by contract with private institutions, provide for the support of the foundlings, insane and other charitable objects of the city and appropriate the public money for that purpose. The court in that case says: "If the city has not provided for such persons, or if they can be better taken care of and trained in those, or such institutions, than in the institutions of the city, we can perceive no good reason why the city may not contract for such care and training." *St. Mary's Industrial School v. Brown*, 45 Md. 335.

We can see no reason why the insane of the state, not belonging to the city of St. Louis, who are found in the city, may not be cared for and supported in its insane asylum at the public expense, if it can be as well and economically done. The expediency of providing for their support is a matter that must be left to the discretion of the legislature. We only pronounce upon the constitutionality of the eighth section of the act and say it is not in conflict with the constitution.

The writ is made peremptory. All concur, except SHERWOOD, GANTT and BURGESS, JJ., who dissent.

### STATEMENT BY SHERWOOD, J.

The alternative writ of *mandamus* issued in this cause required the state auditor against whom the writ ran, to show cause why he should not draw certain warrants on the state treasurer, for certain sums due monthly under the provisions of section 8 of an act entitled "An act to appropriate money for the support * * * of the indigent insane in the asylum at St. Louis for the years 1893 and 1894," approved April 1, 1893.

The section in question is the following: "For the support of the indigent insane in the insane asylum of the city of St. Louis, who belong to the state outside of the city of St. Louis, fifty thousand dollars ($50,-000), which sum shall be paid upon the requisition of the treasurer, indorsed by the mayor of the city of St. Louis and approved by the governor, in equal monthly installments."

The warrants aforesaid, drawn for the support of indigent insane outside of the city of St. Louis, were drawn by the city treasurer on the state treasurer, and in accordance with the section in dispute, were duly indorsed by the mayor of the city of St. Louis, and by

the acting governor of the state of Missouri, and presented to the state auditor, who being thereupon requested to draw his warrants on the state treasurer therefor, refused so to do.

These, in practical substance, are the allegations of the alternative writ, to which the state auditor interposed these grounds of demurrer:

"*First.* Because said alternative writ and the matters therein set forth do not state facts sufficient to constitute a cause of action.

"*Second.* Because said alternative writ is not sufficient in law to entitle the relator to the relief asked, or to authorize the issuing of said writ of *mandamus.*

"*Third.* Because, under the allegations contained in said writ, relator is not entitled to *mandamus* nor to any relief in the premises.

"*Fourth.* Because section 8 of the act of the legislature approved April 1, 1893, referred to in said writ is invalid, unconstitutional and void."


SHERWOOD, J. (*dissenting*).—1. The general grounds of demurrer may be laid out of view because the whole controversy raised by the pleadings centers on the validity of the section in controversy. Is that section constitutional?

In order to determine this question, requires a recital and examination of certain provisions of the organic law pertinent to the point at issue.

Section 43, of article 4, of the constitution provides that: "All revenues collected and moneys received by the state from any source whatsoever shall go into the treasury, and the general assembly shall have no power to divert the same, or to permit money to be drawn from the treasury, except in pursuance of regular appropriations made by law. All appropriations of money

by the successive general assemblies shall be made in the following order:

"*First.* For the payment of all interest upon the bonded debt of the state that may become due during the term for which each general assembly is elected.

"*Second.* For the benefit of the sinking fund, which shall not be less annually than $250,000.

"*Third.* For free public school purposes.

"*Fourth.* For the payment of the cost of assessing and collecting the revenues.

"*Fifth.* For the payment of the civil list.

"*Sixth.* For the support of the eleemosynary institutions of the state.

"*Seventh.* For the pay of the general assembly, and such other purposes not herein prohibited as it may deem necessary; but no general assembly shall have power to make any appropriation of money for any purpose whatsoever, until the respective sums necessary for the purposes in this section specified have been set apart and appropriated, or to give priority in its action to a succeeding over a preceding item as above enumerated."

These provisions limit and set the bounds to legislative appropriation of the state revenues. Such appropriations are to be "regular appropriations made by law." They are to be made for public or state purposes, as such purposes alone are designated in the quoted section.

The maxim *expressio unius, etc.* (Broom's Leg. Max. [6 Ed.], 626), applies to the construction of constitutions as well as of statutes. *Com. v. Williams,* 79 Ky. 42; *Oregon R'y & Nav. Co. v. Oregonian R'y Co.,* 130 U. S. 1; *Page v. Allen,* 58 Pa. St. 338; Cooley, Const. Lim. [6 Ed.], pp. 78, 79, 93, 94; *People v. Draper,* 15 N. Y. 532.

Thus THOMPSON, C. J., enunciating this view,, said: "In construing the constitution of the state, whatever is not expressly denied to the legislative power is possessed by it. The opposite of this rule, I may remark, is the rule of construction of the federal constitution. I assent to this, but not that the inhibitions of the constitution must be always express. They are equally effective, and not less to be regarded, when they arise by implication, and this is the case when the legislative provision is repugnant to some provision of the constitution. 9 Watts, 200; 5 W. & S. 424; 12 S. & R. 330; 3 Casey, 444; 5 Wright, 403 To illustrate this idea: The executive power of the state under the constitution is lodged in a governor, and the legislative in a senate and house of representatives. It would be manifestly repugnant to these provisions of the constitution if an act of assembly should provide for the election of two executives, or two senates and houses of representatives at the same election; yet it would be unconstitutional only by implication, there being no express prohibition on the subject. So in regard to qualification for office. An act which should require a residence in the state for ten years, instead of three, or an age of fifty years, or freehold estate, in order to be eligible to the office of representative, would be void for repugnancy, because differing from the qualification expressed in the constitution, and would be so only by necessary implication; necessary to keep legislation within the paramount rules of the constitution. The expression of one thing in the constitution, is necessarily the exclusion of things not expressed. This I regard as especially true of constiutional provisions, declaratory in their nature. The remark of Lord Bacon, 'that, as exceptions strengthen the force of a general law, so enumeration weakens, as to things not enumerated', expresses a prin-

ciple of common law applicable to the constitution, which is always to be understood in its plain, untechnical sense. *Commonwealth v. Clark*, 7 W. & S. 127." *Page v. Allen*, 58 Pa. St. 338.

An eminent jurist and author says: "Another rule of construction is, that when the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases. On this ground it has been held by the supreme court of Maryland, that where the constitution defines the qualifications of an officer, it is not in the power of the legislature to change or superadd to them, unless the power to do so is expressly or by necessary implication conferred by the constitution itself. Other cases recognizing the same principle are referred to in the note. * * * We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the

immense importance of the powers delegated, and with a view to leave as little as possible to implication." Cooley on Const. Lim. [6 Ed.], pp. 78, 79, 93, 94.

Touching the same topic, DENIO, C. J., says: "But the affirmative prescriptions and the general arrangements of the constitution are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon the lawmaking authority as strong as though a negative was expressed in each instance." *People v. Draper*, 15 N. Y. 544.

Hence under the authorities cited, by inevitable implication the legislature was powerless, because forbidden to appropriate the revenues of the state to a purpose not a public one; a purpose not named in the appropriation specified in section 43 of the organic law.

2. The maxim *ejusdem generis* is equally applicable to the legal situation here presented. The St. Louis insane asylum is not one of the eleemosynary institutions of the state. R. S. 1889, sec. 5671.

"It is said to be a good rule of construction, that 'where an Act of Parliament begins with words which describe things or persons of an inferior degree and concludes with general words, the general words shall not be extended to anything or person of a higher degree,' that is to say, 'where a particular class (of persons or things) is spoken of, and general words follow, the class first mention is to be taken as the most comprehensive, and the general words treated as referring to matters *ejusdem generis* with such class.'"

Broom's Leg. Max. [6 Am. Ed.], 625 and cases cited. See, also, *State v. Bryant*, 90 Mo. 534 and cases cited.

In the case just cited, a familiar example of the operation of this *"good rule of construction"* is cited and is found in the case of *Rex v. Whitnash*, 7 B. & C. 596. Statute 29, Car. 2, chap. 7, section 1, provided "that no tradesman, artificer, workman, laborer, or other person *whatsoever"* should exercise his ordinary calling on the Lord's day. And thereupon it was ruled that the words "other person" did not include *a farmer*, because not of like denomination with those specifically mentioned; BAILEY, J., remarking that, if *all persons* were meant, there was no need of the *specific enumeration.*

So here, if the preceding words in section 43 do not limit the power of appropriation by the legislature to the particular objects specified in that section or those of the same denomination or class, then the general words *"and such other purposes not herein prohibited as it may deem necessary"* amount to a *carte blanche* to the legislature to appropriate the state moneys without restriction, limit, stint, let or hindrance, and renders the particular words wholly superfluous and entirely meaningless. But in order to reach such a result must needs argue that the framers of the constitution were singularly infelicitous in their choice of language in expressing their meaning, and singularly redundant and prodigally profuse in their use of words. But such a presumption can not be indulged; for to repeat a quotation already made: "It is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication."

Authorities almost numberless establish and enforce the rule as above laid down, and show the unbroken uniformity with which the maxim *ejusdem generis* is administered, and applied in the construction of statutes, and the same method of construction is applied to constitutions. *State ex rel. v. Macon Co. Court*, 41 Mo. 453.

A few additional instances of the application of the canon of construction heretofore noted as applicable to the construction of statutes will now be cited and quoted. Thus a recent author of conceded merits says:

"When there are general words following particular and specific words, the former must be confined to things of the same kind. * * * Where an act imposed a penalty on any person hauling 'any timber or stone or other thing, otherwise than upon wheeled carriages,' it was held not to extend to *straw*, but was confined to things as weighty and as likely to cause injury to roads as timber or stone. It was provided by the winding up acts that the court might wind up a company if a special resolution was passed, or the business of the company was not commenced within a year, or the number of members was reduced below seven, or the company was unable to pay its debts, or if the court thought it just and equitable that the company should be wound up. It was held that the grounds upon which the court might form its conclusion must be *ejusdem generis* with those already enumerated.

"Landlords were authorized by statute to distrain for rent 'all sorts of corn and grass, hops, roots, fruits, pulse, or other product whatsoever, which shall be growing on any part of the estates demised.' This did not include *trees, shrubs* and *plants* growing in a nursery garden. The memorandum of a company stated that the company was formed for the purpose, among others, 'of carrying on the business of mechanical engineers

and general contractors.' A question was: What was the scope of the concluding words, 'general contractors.' Lord Cairns said: 'Upon all ordinary principles of construction, these words must be referred to the part of the sentence which immediately precedes them; * * therefore * * * the term 'general contractors' would be referred to that which goes immediately before, and would indicate the making generally of contracts connected with the business of mechanical engineers. * * * If these words were not to be interpreted as I have suggested, the consequence would be that they would stand absolutely without any limit of any kind.' * * *

"* * * When a specific enumeration concludes with a general term it is held to be limited to things of the same kind. It is restricted to the same genus as the things enumerated. * * * , On the same principle 'parochial relief or other alms' means other parochial alms. 'Cities, towns, corporate boroughs and places' do not include places which are not incorporated. An act empowering justices to determine differences between masters and persons in several employments, and 'servants in husbandry, artificers, handicrafters,' and finally 'all other laborers,' does not by these words extend to a domestic servant, nor to a man employed to take care of goods seized under a writ. * * *

"A statute exempted from taxation 'every building erected for the use of a college, incorporated academy or other seminary of learning.' As all those enumerated were *corporations*, it was held that the general words 'or other seminary' required that such institution should also be *incorporated* in order to have the benefit of the exemption." Sutherland on Stat. Construction, secs. 268, 269, 270, 272, and cases cited.

Under these authorities and precedents, it seems needless to make the assertion that an *appropriation* of $50,000, "For the support of the indigent insane in the insane asylum of the city of St. Louis who belong to the state outside of the city of St. Louis" (though the object of the appropriation be *charitable*), is not *ejusdem generis* with the *"eleemosynary institutions of the state."* Nor indeed with anything else contained in section 43 aforesaid.

3. Section 8 is also obnoxious to other constitutional objections. Section 46 of the same article of the constitution declares: "The general assembly shall have no power to make any grant, or to authorize the making of any grant, of public money or thing of value to any individual, association of individuals, municipal or other corporation whatsoever: *Provided*, that this shall not be so construed as to prevent the grant of aid in a case of public calamity."

It is conceded that if the appropriation under discussion had been made *"for the support of the insane asylum of St. Louis, there could be no doubt of its unconstitutionality."*

The first appropriation after the adoption of the present organic law, appropriated $70,000 "for the support of the St. Louis county insane asylum." Laws, 1877, p. 14, item 3. But this item of appropriation met the prompt veto of Governor Phelps, as appears by his message to that effect. House Journal, 1877, p. 785, *et seq.*, and his letter to the secretary of state, p. 1151, *Ib.*

Since then, the Scheme and Charter having been carried into effect by the separation of the city and county of St. Louis, the language of the appropriation has been changed to what it now is, but no such appropriation was again attempted *until after January 1, 1881.* (See Laws, 1881, p. 5, sec. 6, $30,000; Laws,

1883, p. 5, sec. 6, $50,000; Laws, 1885, p. 6, sec. 6, $50,000; Laws, 1887, p. 6, sec. 6, $70,000; Laws, 1889, p. 13, sec. 1, item 4, $70,000; Laws, 1891, p. 21, sec. 8, $85,000; Laws, 1893, p. 17, sec. 8, $50,000.)

The change, however, in the language of the appropriation, does ' not alter its real meaning, *nor change the current of the appropriation; it still flows to the "insane asylum of the city of St. Louis," and is there disbursed.* The alteration in the language of the appropriations since the occurrence of the veto message, is significant as showing an industrious endeavor to meet the objections of the message, to evade the letter of the constitution, while disregarding its obvious spirit and meaning. But as said in *State ex rel. v. The Judges*, 21 Ohio St. 11, the constitutionality ·of a statute is to be determined by its *operation*, and not by the *mere form* it may be made to assume.

Courts of justice are not to be imposed on by diaphanous disguises which change the verbiage of the statute, but leave the effect the same. When the act questioned is "clearly *evasive*" of constitutional prohibitions, courts will not fail to notice the evasion nor to apply the remedy. Cooley on Const. Lim. [6 Ed.], 153. The restrictions of the organic law can not be evaded by resort to misleading forms; a fraud on their policy, an attempt to evade their force and effect, is an attempt to do *indirectly* what has been *directly* forbidden. *Kendrick v. Cole*, 61 Mo. 572. "The law abhors subterfuge; it despises mean dodges and evasions." *Littleton v. Clayton*, 77 Ala. 571.

After all said and done, an appropriation "for the support of the indigent insane in the insane asylum of the city of St. Louis who belong to the state outside of the city of St. Louis," is but an appropriation *pro tanto for the support of the insane asylum*, and the ratio of that support will be determined by the number of

such indigent insane as compared with the number of those in the asylum not included in that class.    Counsel for relator suggests that such indigent insane "should be supported out of the general revenue, because manifestly, *from their condition, it could not be ascertained to what locality they belong and ought to be sent.*"    But, if this be true, *how then are the authorities in St. Louis to determine that such indigent insane "belong to the state outside of the city of St. Louis?"* Unless there are *peculiarities* of the indigent insane who are supposed to reach the metropolis from the *rural regions* of the state, which distinguish them from the *urban* insane, it would seem extraordinarily difficult to apply and disburse an appropriation to those only, and only those for whom it was intended.    But enough of this.

4.    Section 8, in its race for validity, encounters other constitutional obstacles; it is a local and special law.    Sec. 53, art. 4, Const.; *State ex rel. v. Hermann,* 75 Mo. 340, and cases cited.

No notice has been published, as is requisite under the provisions of section 54, article 4, of the constitution, and such notice is not recited in the act, as by that section is required.

5.    And the fact that section 8 is embodied in the midst of a general appropriation act does not deprive it of the attributes and features of a local or special law.

6.    Section 8 also falls under the ban of that constitutional provision which forbids a local or special law to be passed when a general law can be made applicable.    Sec. 53, *supra.*    This is made by that section a *judicial* question, and we have no doubt that a general law could be made applicable, conceding, for argument's sake, that a general appropriation law devoted to the object mentioned would be valid.

The premises considered, the peremptory writ should · be denied. I, therefore, dissent from the majority opinion. In this, BURGESS, J., concurs in full; GANTT, J., in paragraphs 3 and 5.