THE STATE EX REL. KANSAS CITY INSURANCE AGENTS' ASSOCIATION v. KANSAS CITY ET AL., Appellants.—4 S. W. (2d) 427.

Court en Banc, March 17, 1928.

*John T. Barker* and *R. J. Ingraham* for appellants.

388

*Hogsett & Boyle* for respondent.

GANTT, J.—Mandamus. Alternative writ issued by the Circuit Court of Jackson County. Peremptory writ awarded. Relator and

respondents will be referred to as plaintiff and defendants, respectively. Defendants appealed.

Plaintiff seeks to compel Kansas City to pay $2500, claimed to be due for fire patrol and salvage corps service (hereinafter referred to as patrol) rendered to the citizens of said city.

Prior to 1903 the city maintained a patrol. In July of that year the city was about to abandon the service. The amount of license taxes collected from fire insurance companies, fire insurance agents and fire insurance brokers was not sufficient to maintain the fire patrol, and the city officials announced the service would be discontinued. Thereupon, the insurance agents of the city reported the matter to the insurance companies, and this resulted in the incorporation of the Kansas City Insurance Agents' Association with a capital stock of $5000 (later, it seems, increased to $20,000) to operate the patrol. The insurance companies furnished the money; and while the stock was in the name of insurance agents, it was held in trust for the benefit of the insurance companies. Plaintiff submitted an offer to the city in the form of an ordinance. It is as follows:

"Be it Ordained by the Common Council of Kansas City, Missouri:

"Section 1. There is hereby granted the Kansas City Insurance Agents' Association, a corporation organized under the laws of the State of Missouri, the right to maintain, operate and control a Fire Patrol & Salvage Corps co-extensive with the limits of Kansas City, and to do all things needful to the operation, maintenance and control thereof, for a period of thirty years from and after the acceptance of the terms of this ordinance by the said Association, but this franchise shall not be transferred or assigned without the consent of the common council.

"Section 2. The said Kansas City Insurance Agents' Association in carrying out the purpose of this ordinance, shall have free right to run the streets of Kansas City with its vehicles and apparatus, subject only to such regulations incident thereto as may govern the Kansas City Fire Department, and shall have free access to and the right to enter all premises and buildings threatened by fire, or where a fire may be in progress, or any building or premises contiguous thereto; provided, however, that said Association shall at all times hold Kansas City harmless from any loss or damage by reason of the acts of said Association, its agents, servants or employees.

"Section 3. All apparatus, equipment, horses, harness, utensils and property of all kinds whatsoever now held and owned by Kansas City, now in the possession and under the control of the Kansas City Fire Patrol, as now operated by Kansas City, shall be turned over to the said Association, and shall hereafter be held and controlled by said Kansas City Insurance Agents' Association, for the pur-

pose of carrying out the provisions of this ordinance; provided, however, that if said Association should fail or refuse to maintain and operate said Fire Patrol & Salvage Corps for a period of five years from the date of the acceptance of this ordinance, then and in that event said Association shall return to Kansas City all apparatus, equipment, horses, harness, utensils and property of all kinds held and used for the purposes of such Fire Patrol & Salvage Corps, but in no event shall Kansas City be liable to maintain said apparatus, equipment, or property, or to bear any expense in connection with the operation of said Fire Patrol & Salvage Corps and no liability shall be hereafter created or assumed by Kansas City on account thereof, save such as may be stipulated for in this ordinance, and providing further, as a condition of this grant, said Association shall maintain two companies with not less than the number of men, and two stations maintained and equipped so as to be equal in efficiency to the Fire Patrol system now in operation in Kansas City.

"Section 4. It shall be the duty of said Association, upon the acceptance of the terms of this ordinance to diligently and efficiently protect and save life and property in or contiguous to burning buildings, and to remove and take charge of such property, or any part thereof, whenever necessary, and authority is hereby granted to said Association to do all things needful to such ends not inconsistent with the charter and ordinances of Kansas City now in existence, or which may change or hereafter be passed; provided that no money shall be collected from any firm or individual or corporation for the maintenance of said patrol, but said Association may after the extinguishment of any fire make a reasonable charge for guarding or handling property when so desired by the owner.

"Section 5. All revenues derived by Kansas City by licenses paid by Fire Insurance Companies, Fire Insurance Agents and Fire Insurance Brokers on hand and unexpended, shall be appropriated for and paid over to the said Kansas City Insurance Agents' Association, for the purpose of supporting and maintaining the said Fire Patrol & Salvage Corps, and all such revenues which may hereafter be derived from such sources last above enumerated by Kansas City, shall be appropriated for and paid over to said Association for the support and maintenance of said Fire Patrol & Salvage Corps quarterly on the first days of January, April, July and October of each year, said sums so appropriated to be expended under the direction and control of said Kansas City Insurance Agents' Association; provided, however, that said Association shall render to Kansas City and file with the City Comptroller semi-annually in January and July of each year, sworn statements of the entire cost of maintenance and operation of said Fire Patrol & Salvage Corps.

"Provided, further, that if at any time, the amount of revenue which may be derived from licenses paid Kansas City by fire insurance companies, fire insurance agents, and fire insurance brokers shall be equal or exceed the cost of such maintenance and operation of said Fire Patrol & Salvage Corps, then and in that event only such sums as may be necessary for such operation and maintenance, shall be appropriated for such purpose.

"Section 6. In no event shall Kansas City be responsible in any wise for the debts or obligations of said Kansas City Insurance Agents' Association contracted in the discharge of the duties imposed under this ordinance, nor shall Kansas City be liable in any manner whatsoever on account of the negligence of said Association in carrying out the provisions of this ordinance.

"Section 7. The city of Kansas City shall supply free of all charge to said Association all fire alarm service at the same time and in the same manner as such service may be supplied to the Kansas City Fire Department.

"Section 8. Upon the failure of said Kansas City Insurance Agents' Association to carry out and fulfill the obligations and duties hereby imposed upon it, all the rights hereby granted to said Association shall thereupon be forfeited. And upon the failure of said Kansas City at any time to appropriate and pay over to said Association the revenues herein agreed to be paid by Kansas City, the obligations hereby assumed by said Association may thereupon cease.

"Section 9. This ordinance shall be in force and become effective upon written acceptance of its terms by said Association being filed with the city clerk within thirty days after the approval of this ordinance.

"Section 10. The ordinance providing for the creation and maintenance of a Fire Patrol and all ordinances or parts of ordinances, in conflict with this ordinance, are, insofar as they so conflict hereby repealed."

The ordinance was passed, became a law on the 7th of September, 1903, and was duly accepted by plaintiff on the 23rd of September, 1903. The patrol has been maintained and operated by plaintiff since the date of acceptance. Plaintiff is not a profit-sharing company and has never declared a dividend. During the time plaintiff has been maintaining and operating the patrol, the money appropriated and paid by the city to plaintiff for the service is only equal to forty-five per cent of the actual cost of the maintenance of the patrol. The secretary draws a salary of $25 per month, and the directors are allowed a small fee for attending meetings. Other officers receive no compensation. On May 24, 1926, the city notified plaintiff it would no

longer pay for the service; whereupon plaintiff instituted this proceeding.

I. Defendants express doubt as to the authority of the city to maintain a patrol. Section 1 of Article III of the 1889 Charter provides as follows:

"The Mayor and Common Council . . . shall have power by ordinance: . . .

"Twenty-ninth. To provide for the maintenance of a fire department, and to make all needful regulations for the prevention and extinguishment of fires. . . .

"Thirty-first. To pass, publish, amend and repeal all such ordinances, rules and police regulations not inconsistent with the provisions of this Charter or the laws of the State, as may be expedient in maintaining the peace, order, good government, health and welfare of the city, its trade, commerce and manufactures, or that may be necessary and proper for carrying into effect the provisions of this Charter."

Patrol service is auxiliary to a fire department, and, we think, falls within the authority given the city to maintain such department. Certainly it falls within the general welfare clause of the charter providing for the "good government, health and welfare of the city, its trade, commerce and manufactures."

Defendants contend that even if the city had the authority to maintain a fire patrol, it had no authority to contract for its maintenance. Authority to maintain a patrol includes authority to contract for its maintenance. The voters of Kansas City did not leave the question in doubt when they adopted the charters of 1908 and 1925. Authority was not only given to maintain a patrol but authority was expressly given to contract with any individual, association or corporation for its maintenance. [Section 1, Article III, Charter 1908; Section 1, Article I, Charter 1925.] In so providing, the action of the city in contracting with plaintiff to render the service was confirmed.

In the case of St. Marys Industrial School v. Brown, 45 Md. l. c. 335, it was held by the Court of Appeals of Maryland that the city of Baltimore could, by contract with private institutions, provide for the support of the foundlings, insane and other charitable objects of the city and appropriate the public money for that purpose. It was said: "If the city has not provided for such persons, or if they can be better taken care of and trained in those, or such institutions, than in the institutions of the city, we can perceive no good reason why the city may not arrange and contract for such care and training."

In Bluffton v. Studebaker, 106 Ind. 129, it is held in effect that the power to purchase fire engines by an incorporated city does not of necessity depend upon the question whether its charter has or has not expressly granted such power, since such power is inherent in the corporation.

To the same effect: State ex rel. St. Louis v. Seibert, 123 Mo. 424, 24 S. W. 750, 27 S. W. 624; Howsmon v. Trenton Water Co., 119 Mo. l. c. 313, 24 S. W. 784; City of Lexington ex rel. Price v. Lafayette County Bank, 165 Mo. 671, 65 S. W. 943; Carleton v. Washington, 38 Kan. 726.

The contention is overruled.

II. Defendants contend the ordinance is not a contract. The requirement that a contract with the city must be made in writing was complied with when the council enacted the ordinance and plaintiff accepted it in writing. [Water Co. v. City of Aurora, 129 Mo. l. c. 578, 31 S. W. 946; 3 McQuillin's Mun. Corp., sec. 1165.]

But it is insisted the ordinance contains no agreement to render the service, and that plaintiff or defendant city "could quit at any time."

By the ordinance plaintiff is granted the right to maintain a patrol "coextensive with the limits of Kansas City" and to do all things needful to the maintenance thereof for a period of thirty years; and it is provided the plaintiff shall diligently and efficiently protect and save life and property; that the city shall not be responsible for the debts of plaintiff contracted in the discharge of these duties; that upon the failure of plaintiff to fulfill the obligations and duties imposed, all rights granted shall be forfeited; and that all patrol equipment belonging to the city shall be delivered to plaintiff for the purpose of carrying out the provisions of the ordinance. Authority is granted to do all things needful to such ends. By these provisions the city did not undertake to control the details of the service. This is not necessary to the validity of the contract. Clearly, by the enactment of the ordinance and its acceptance, plaintiff contracted to maintain and operate the patrol for thirty years and the city contracted to pay for the service. In consideration of the service, the city agreed to and did deliver to plaintiff all apparatus, equipment, horses, harness, utensils and property of all kinds then in the possession of the Fire Patrol for the purpose of carrying out the provisions of the ordinance. The city was not compelled to maintain a patrol. It was authorized to do so. Those in authority had determined to abandon the service, and it was within the power of the city to transfer the property in consideration of the service. This section is inde-

pendent of and separable from the other sections of the ordinance, and if void would not invalidate the whole ordinance. The property has long since disappeared and been replaced by modern equipment, furnished by plaintiff. A further consideration was the agreement of the city to pay all revenues derived from license taxes paid by fire insurance companies, fire insurance agents and fire insurance brokers, provided that if at any time said revenues equalled or exceeded the cost of the maintenance and operation of the patrol, then only such sums as may be necessary to cover that expense shall be appropriated for such purpose.

From September 23, 1903, to May 24, 1926, the parties to the contract did not view the ordinance technically. During all this time plaintiff maintained the patrol, and the city paid for the service. The parties understood the ordinance to require plaintiff to furnish the service and the city to pay for the same. There was no complaint from either party. This construction of the ordinance by the parties "is entitled to great, if not controlling, weight in determining its proper interpretation." [13 C. J. 546, and authorities cited.]

No money penalty was provided for a failure of compliance with the terms of the contract. Such a provision is not necessary to the validity of a contract. Of course, either party could refuse compliance but that would not invalidate the contract. The city can sue and be sued, and contracts made by the city, if authorized, are just like other contracts. They are measured by the same tests and subject to the same rights and liabilities. In Dillon on Mun. Corps. (4 Ed.) sec. 472, it is said: "But with respect to authorized contracts a municipal corporation has the same rights and remedies, and is bound thereby and may be sued thereon in the same manner as individuals."

Plaintiff is required to report, under oath, semi-annually to the city the cost of maintenance of the patrol, and the city is required to make quarterly payments for the service. Should plaintiff fail to render properly the service, the city could and no doubt would refuse payment. During the time the city was operating the patrol it was managed by a fire-patrol committee of the council. While not provided for in the contract, this committee has been continued with jurisdiction over the service; and while it was not provided in the contract that the chief of the fire patrol and all his men should, at a fire, work under the chief of the fire department, it appears that such is the case. These actions tend to show the construction placed on the contract by the parties, and that, as a fact, the patrol was under the supervision of the city.

Attention is directed to cases holding the city could not authorize the use of streets for private enterprises, or lease a wharf owned by

the city to a person with power to make rates, or give arbitrary power to a city officer to grant or refuse permits to conduct business, or authorize a safety council to make traffic laws. These cases do not touch any question in the instant case.

In granting the franchise the city reserved control of its streets by Section 2 of the Ordinance, which provides the plaintiff, in its use of the streets, shall be "subject to such regulations as may govern the Kansas City Fire Department." The contentions are overruled.

III. Defendants contend the agreement to appropriate and pay to plaintiff the revenue derived from the license tax is a surrender of the taxing power of the city. We do not think so. The agreement to pay the amount collected in license taxes from the companies and agents is not a surrender of the taxing power. The license taxes are collected the same as other taxes and without reference to the contract, and an appropriation is necessary to a payment of the money. By the contract the city merely agrees to expend a stipulated sum for the service. The city is interested in having proper fire patrol service. If plaintiff furnishes the service, the city is not concerned with the disposition of the money by plaintiff.

It is argued the insurance companies are the only beneficiaries of the service. The contention rests on the fact the patrol service minimizes the losses of the insurance companies. It could with as much reason be argued the insurance companies were the sole beneficiaries of the service rendered by the fire department. Both services are rendered regardless of insurance. The contention is foreclosed for the reason the city for years prior to 1903 maintained a patrol as of benefit to the public. In addition, the voters, by providing in 1908 and 1925 for the maintenance of a patrol and authorizing the city to contract for same, determined the service was of benefit to the public. The contentions are overruled.

IV. Defendants contend the contract is a delegation of the city's governmental power. The city was authorized to maintain a patrol and to contract for its maintenance. It exercised its governmental power in contracting for the service and exacting a compliance with the contract.

In the case of Valley Spring Hog Ranch Co. v. Plagmann, 282 Mo. l. c. 10, 220 S. W. 1, we held that the city of Joplin had authority to contract for the disposal of garbage and that it was an exercise of its police power.

In Manske v. City of Milwaukee, 123 Wis. 172, 101 N. W. 377, it was held that the establishment of a fire department was a govern-

mental function of the city and that the city had the incidental power to make contracts for carrying out such functions. To the same effect: Fitch v. Seymour Water Co., 139 Ind. 214, 37 N. E. 982; State ex rel. Ellis v. Tampa Waterworks Co., 19 L. R. A. (N. S.) 183; City of Macon v. Bibb County, 138 Ga. 366, 75 S. E. 435; State ex rel. v. Seibert, 123 Mo. 432; St. Louis Hospital Association v. St. Louis, 15 Mo. 592. The contention is overruled.

V. Defendants' next contention is as follows:

"If the work performed by the fire patrol is solely for the purpose of minimizing and reducing fire insurance losses for the benefit of fire insurance companies, then the city had no legal authority to use public tax money for such purposes, and cannot legally contract with the fire patrol to do so."

We are cited to Section 3, Article X, Sections 46 and 47, Article IV, and Section 6, Article IX, of the Constitution of Missouri. The sections prohibit the use of public money for a private purpose.

It will be noted the claim of conflict with the Constitution rests on the assumption that the patrol service is solely for the purpose of minimizing and reducing fire insurance losses. The contention is without merit for the service is not solely for such purpose. The insurance companies are incidentally benefited, but this does not invalidate the contract. [Jasper County Farm Bureau v. Jasper County, 286 S. W. 381.]

Attention is directed to the case of State ex rel. v. St. Louis, 216 Mo. 47. In that case the city did not undertake by contract or otherwise to maintain an art museum. The art museum was a department of Washington University, and the question involved was the right of the city to make a donation of public money to Washington University.

Attention is also directed to the case of Re Thomas Page, 60 Kan. 842, 47 L. R. A. 70. In that case the validity of an act taxing contracts of insurance made with companies not authorized to do business in Kansas was under consideration. The act provided that two-fifths of the tax collected should be paid to the treasurer of the city in which said property so insured was situated for the benefit of volunteer fire departments. It was ruled the taxing power of the State could not be exercised to bestow public money on volunteers who are not employed by the municipality and for whose service no expenses are assumed or incurred by it. This authority is not in point. The law creating and providing for the tax pledged a part of it in advance as a donation to volunteer fire departments. In this case, as already observed, the tax is levied without reference to the contract,

and the revenue thus derived is later paid out under the terms of a contract for patrol service. The contention that the ordinance is in conflict with the Constitution is overruled.

VI. Defendants contend plaintiff has not fully performed its part of the contract. It is not contended that plaintiff when in attendance at a fire did not render efficient service, but that plaintiff should have answered every "first call" to a fire at any place within the city limits.

In the business district the patrol responds to every fire alarm; elsewhere it does not do so, but responds to a "second call" from the district chief in charge of the fire. The reason for a division of the city into first and second call districts is to avoid useless runs by the patrol to outlying sections to trash, automobile and other small fires. The city while operating the patrol had a "first-call" district, and the service now rendered by the city fire department in the outlying districts is not the same as that rendered in the business district. Many business men of Kansas City testified to the efficiency of the service, and there is no evidence that the first-and second-call districts maintained by plaintiff are unreasonable, or that the service is inefficient or inadequate. In fact, defendants offered no testimony on this point. The contract does not require plaintiff to respond to "first-calls." It does require efficient service, and it is undisputed that "first-call" service is not necessary to an efficient service in the outlying sections of the city. By responding to "second-call" service in the outlying districts, plaintiff has complied with the contract. The contention is overruled.

VII. Defendants contend that mandamus is not the proper remedy. On the trial it was expressly agreed "that on January 1, 1927, and at all times since and at the present time it was and is now the duty of defendant mayor and council by ordinance to appropriate money from the treasury of said city, and the duty of defendant director of finance to draw warrants on the city for the payment of such obligations, and the duty of said city treasurer to pay said warrants on presentation."

It was further expressly agreed "that the amount of revenue derived from license fees paid to Kansas City by fire insurance companies, fire insurance agents and fire insurance brokers between May 24, 1926, and January 1, 1927, was and is $2500, and that said sum was on January 1, 1927, and at all times since has been and is now in the fire-patrol and salvage-corps fund in the city treasury and is an unincumbered balance in said fund."

Plaintiff has complied with the contract, the city is without a defense, and the defendants, on the admitted and undisputed facts, have no discretion in the matter. The money is isolated in the city treasury as an unincumbered balance awaiting appropriation for this particular purpose; therefore, it is the mandatory duty of defendant officers, to appropriate, draw a warrant for and pay plaintiff for the service. [38 C. J. 748, 760, 768, 769; High on Extraordinary Legal Remedies (3 Ed.) sec. 106; State ex rel. Bell v. Holman, 293 S. W. 93; State ex rel. Holman v. Trimble, 293 S. W. 98.]

The judgment should be affirmed. It is so ordered. All concur.