QUESTIONS:
1. Would participation by the City of Lakeland in the formation of a reciprocal insurance association composed entirely of Florida municipalities and organized under Ch. 629, F. S., contravene s. 10, Art. VII, State Const.?
2. Would the expenditure of city funds for contribution to the required expendable surplus of a reciprocal insurer owned and operated entirely by the subscribing municipalities be a lawful expenditure for a municipal purpose?
3. Could the participating municipalities create the expendable surplus required of reciprocal insurer by Ch. 629, F. S., through contribution of revenue certificates or other certificates of indebtedness of the participating municipalities in lieu of cash for payment of the proportionate shares of the surplus requirement for the issuance of nonassessable insurance policies to the subscribers of such reciprocal insurer?
SUMMARY:
Assuming that it could qualify as a subscriber to a reciprocal insurance association under s. 629.191, F. S., a municipality may subscribe to and join in the formation of a reciprocal insurer organized under Ch. 629, F. S., and composed entirely of Florida municipalities without contravention of s. 10, Art. VII, State Const. Municipal funds contributed pro rata to the required expendable surplus of the reciprocal insurer would constitute expenditures for municipal purposes, i.e., indemnity against municipal tort liability, casualty losses, and property losses at reasonable costs. In the absence of clarification or administrative determination otherwise by the Department of Insurance, it appears that a municipality could not make its pro rata contribution to the required surplus fund of the reciprocal insurer in the form of certificates of indebtedness in lieu of cash.
The questions which you pose necessarily assume that municipalities qualify under s. 629.191, F. S., to become subscribers to a reciprocal insurance association. The discussion of your inquiries is likewise premised upon that assumption.
AS TO QUESTION 1:
Section 10, Art. VII, where pertinent, provides:
 Neither the state nor any . . . municipality . . . shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person. . . .
The reciprocal insurer which the City of Lakeland proposes to join is apparently one authorized by Ch. 629, F. S. Such an insurer is an unincorporated association which transacts business as a legal entity through an attorney-in-fact. The members of the association agree to indemnify each other from designated risks of loss. Sections 629.011, 629.021, 629.061, 629.081, and 629.101, F. S.
The statement of facts submitted in your request indicates that membership in the proposed reciprocal association will be limited to Florida municipalities. In view of that, it is my opinion that no violation of s. 10, Art. VII, State Const., would result from the joinder of such municipalities in a reciprocal insurance association or from the contribution of city funds to the required surplus of the insurance fund.
Political subdivisions of the state, including municipalities, are not associations, persons, or corporations to which the proscription of s. 10, Art. VII, supra, applies. Attorney General Opinions 058-9 and 072-382 and cases therein cited. Cf. Overman v. State Board of Control, 62 So.2d 696 (Fla. 1953) [holding a nonprofit educational institution was not within the prohibition against pledging public credit for benefit of individual company, corporation or association under s. 10, Art. IX, State Cosnt. 1885.]
Likewise, the fact that the cities will contribute to the required expendable surplus of the reciprocal insurance association and, in effect, become joint owners of an association which is not itself a municipality would not constitute a violation of s. 10, Art. VII, supra, under the facts presented in your inquiry. The proposed association would not constitute a private association, one having no official duties or concern with the affairs of government and organized primarily for the personal emolument of its members. See O'Malley v. Florida Ins. Guaranty Association,257 So.2d 9 (Fla. 1971). Rather, the association would be in the nature of a public or quasi-public entity organized primarily to discharge duties to the public or to provide a governmental benefit. See Forbes Pioneer Boat Line v. Board of Commissioners of Everglades Drainage Dist., 82 So. 346, 350 (Fla. 1919); O'Malley v. Florida Ins. Guaranty Association, supra. Cf. AGO 051-167, concluding that a county school board could insure school buildings against loss by fire, etc., under a policy issued by a mutual fire insurance company if the policy stipulated that it was issued without contingent liability and was nonassessable. The opinion concluded that such a participating policy did not make the state or any political subdivision a `joint owner or stockholder' within the purview of former s. 10, Art. IX, State Const. 1885 [now s. 10, Art. VII, State Const.]. See also Dade County Bd. of Pub. Instr. v. Michigan Mut. Liability Co.,174 So.2d 3 (Fla. 1965), holding that the purchase of a nonassessable liability insurance policy from a mutual company would not make a county school board a joint owner or stockholder in any company, association, or corporation in violation of s. 10, Art. IX, even though the school board, as an insured, would become a member of the mutual company entitled to vote for directors, where the only interest obtained by the board as an insured in addition to insurance protection would be the availability of rebates if the loss experience of the mutual company justified them.
The primary purpose in joining a reciprocal insurer would be to obtain indemnity against liabilities and casualty losses of the municipality. Municipalities have historically been held subject to tort liability in varying degrees, even prior to the advent of s. 768.28, F. S., as amended by Ch. 77-86, Laws of Florida. See,generally, Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957); Gordon v. City of West Palm Beach, 321 So.2d 78 (4 D.C.A. Fla., 1975); Modlin v. City of Miami Beach, 201 So.2d 70 (Fla. 1967); AGO 076-41. Cf. AGO 075-114 (hospital districts not possessed of sovereign immunity). Parenthetically, I would note at this juncture that the Legislature has expressly provided in Ch.77-86 that the limitations of liability established by s. 768.28, as amended, apply to all agencies and subdivisions of the state, including municipalities, regardless of whether those agencies and subdivisions possessed sovereign immunity prior to July 1, 1974. Accordingly, the statements in AGO's 075-114 and 076-41 to the effect that the liability limits of s. 768.28, F. S., do not apply to municipalities or hospital districts no longer obtain, and, to that extent, those opinions are hereby modified. With regard to the public nature of the contemplated expenditure, it follows that, if municipal treasuries are vulnerable to claims of tort victims and casualty losses, then, under the broad home rule powers authorized for municipalities by s. 2(b), Art. VIII, State Const., and s. 166.021, F. S., the protection of the treasury by provision for insurance or indemnity against such claims or losses by any means not expressly prohibited by law would be a legitimate municipal purpose, unless prohibited by a city's charter enacted subsequent to July 1, 1973. See s. 166.021(1)-(4).
Similarly, the prevention of casualty loss to a municipality's property has historically been recognized as a valid municipal purpose which may be achieved by contracting for property protection services from a private entity. See, e.g., State v. Kansas City, 4 S.W.2d 427 (Mo. 1928). Cf. Dade County Bd. of Pub. Instr. v. Michigan Mut. Liability Co., supra. Thus, under the provisions of s. 2(b), Art. VIII, State Const., and s. 166.021, F. S., the protection of the municipality from property loss by obtaining insurance in a manner not expressly prohibited by law would be a legitimate municipal purpose.
Moreover, the preamble to Ch. 77-86, supra, clearly recognizes that the Legislature deems the provision of liability insurance to be a legitimate public purpose of local government. One purpose of Ch. 77-86, as recited by its preamble, is to aid local governments in obtaining insurance at reasonable rates. There is, therefore, a strong presumption that the contemplated expenditure is primarily for a public or municipal purpose.
Since the proposed reciprocal insurance association would be formed primarily to serve as the instrument for achieving such municipal purposes, it would constitute a public or quasi-public entity not within the proscription of s. 10, Art. VII, supra.
Nor would the fact that the business of the association will be administered by a private entity appointed by its constituent governmental agencies as attorney-in-fact result in a violation of s. 10, Art. VII, supra. The attorney-in-fact will obviously perform services for the association and its members and will no doubt be compensated for those services. To that extent the members' contributions will benefit a private person or corporation. But, municipalities may expend moneys which incidentally benefit a private person or business without detracting from the public nature of the expenditure, so long as there is some clearly identified public purpose which is the primary objective of the expenditure and so long as some control over the expenditure is retained by the public authority to avoid frustration of the public purpose. Attorney General Opinions 075-71 and 073-394. See Betz v. Jacksonville Transp. Auth.,277 So.2d 769 (Fla. 1973), holding that a management contract between a public transportation authority and a private bus company for operation of a municipal transit system, although in excess of 1 year, did not constitute the constitutionally proscribed lending of public credit to a private firm or corporation since the contract primarily furthered the public purpose of providing public transportation and only incidentally benefited the private management company. The requisite degree of control over the expenditure may be maintained pursuant to s. 629.101, F. S., which provides, inter alia, that the subscribers may impose restrictions upon the power of attorney granted to the attorney-in-fact and may provide for the revocation of the powers granted.
For the foregoing reasons, your first question is answered in the negative.
AS TO QUESTION 2:
The issue comprehended within question 2 is whether the contribution by a given city to the required surplus fund of the reciprocal insurance association would be an expenditure for that municipality's purpose, since the surplus fund is intended and will be used to satisfy claims against other member cities. The discussion in reference to your first question essentially answers your second question as well. As noted above, s. 166.021, F. S., provides broad authority to municipalities to exercise powers for municipal purposes. For example, s. 166.021(1) provides:
 . . . [M]unicipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law. [See also
s. 166.021(4), expressing the legislative intent to like effect.]
In addition, Ch. 77-86, supra, clearly indicates that obtaining reasonably priced liability insurance by municipalities is a legitimate municipal purpose. There being no express prohibition in law against the employment of the reciprocal insurance form or mechanism by municipalities, and the purpose of each city joining the reciprocal insurer being primarily to obtain indemnity against its own liabilities or losses at reasonable expense, I see no impediment to a city's joinder in the proposed reciprocal insurance association (if qualified to become a subscriber to the association under Ch. 629, F. S.) should the city find that course is advisable in reducing its insurance costs.
Your second question is accordingly answered in the affirmative.
AS TO QUESTION 3:
Your third question requires interpretation of the insurance laws of Florida. Section 629.071(1) and (2), F. S., governs the general surplus requirements of reciprocal insurers and s. 629.261, F. S., governs additional surplus requirements for reciprocals to issue nonassessable policies. Section 629.071 provides:
 (1) A domestic reciprocal insurer hereunder formed, if it has otherwise complied with the applicable provisions of this code, may be authorized to transact insurance if it has and thereafter maintains surplus funds as follows:
 (a) To transact property insurance, surplus funds of not less than $200,000;
 (b) To transact casualty insurance (other than workmen's compensation), surplus funds of not less than $200,000.
 (2) In addition to surplus required to be maintained under subsection (1), the insurer shall have, when first so authorized, expendable surplus in amount as required of a like foreign reciprocal insurer under s. 624.408. (Emphasis supplied.)
Section 629.261 allows a reciprocal insurer to issue nonassessable policies if it `has a surplus of assets over all liabilities at least equal to the minimum paid-in capital stock required of a domestic stock insurer authorized to transact like kinds of insurance. . . .'
The Department of Insurance is charged with the duty of administering and enforcing the insurance laws of this state and has the final decision-making authority with regard to whether revenue certificates, revenue bonds, or other like obligations of the city payable from non-ad valorem taxes and made payable to the proposed reciprocal insurer could be used in lieu of cash as the city's proportionate share of the surplus funds required by Ch. 629, F. S. I am not advised as to that department's practices in that regard or as to its administrative construction of the governing statutes. However, for the following reasons it appears to me that such certificates of indebtedness would not be acceptable to make up the required surplus fund.
Firstly, although the term `funds' is subject to a variety of meanings, it may be synonymous with cash, and in common usage suggests money. See, e.g., Owen v. Bank of Glade Springs,81 S.E.2d 565 (Va. 1934); McCammon v. Cooper, 69 N.E. 658 (Ohio 1904); 37 C.J.S. Fund, p. 1401. With respect to the amount of surplus required to be maintained to transact property insurance and casualty insurance within s. 629.071, F. S., the Legislature stated the amount to be maintained in figures ($200,000). This description of the amounts required to be maintained as surplus funds in order to transact property and casualty insurance would seem to connote and contemplate legal United States tender — cash — and no other form or kind of assets or contributions to the required surplus. Cf. AGO 074-374.
Secondly, the inference that the term `funds' as used in s.629.071, supra, is synonymous with cash or its equivalent is strengthened by other provisions of the Insurance Code dealing with the formation of a reciprocal insurer and with accounting by insurance companies.
Section 629.081(2)(h), F. S., requires the attorney-in-fact for the proposed reciprocal insurer upon application for authority to transact business to certify:
 [t]hat all moneys paid to the reciprocal shall, after deducting therefrom any sum payable to the attorney, be held in the name of the insurer and for the purposes specified in the subscribers' agreement. (Emphasis supplied.)
Thus, specific reference to money is made by statute in the context of determining the authority of a reciprocal insurer to intially transact business. Moreover, it must be recalled that, with reference to the issuance of nonassessable policies, a reciprocal insurer must demonstrate that it has a surplus of assets over liabilities equal to a certain amount. Section629.261, F. S., supra. Chapter 625, F. S., deals generally with the acceptability of assets for purposes of determining the financial condition of an insurer. Section 625.031(2) provides:
 In addition to assets impliedly excluded by the provisions of s. 625.012, the following expressly shall not be allowed as assets in any determination of the financial condition of an insurer:
 (2) Advances (other than policy loans) to officers, directors, and controlling stockholders, whether secured or not, and advances to employees, agents and other persons on personal security only.
Such advances are excluded in calculating assets because the need for financial soundness of insurers precludes an insurance company from claiming what is essentially a loan to itself (its owners and officials) as an asset in determining solvency. It can readily be seen that creating a surplus fund for a reciprocal insurer from the subscribers' promises to pay, in lieu of cash, is closely analogous to a stock insurance company's counting a loan to a principal stockholder as an asset. It therefore appears that the use of certificates of indebtedness of the member cities, in lieu of cash or other acceptable assets, to constitute the proposed reciprocal insurer's surplus fund would contravene the Insurance Code. Additionally, I would note that the use of tax anticipation certificates payable from ad valorem taxes for the stated purpose would contravene s. 12, Art. VII, State Constitution.
However, a municipality could issue revenue certificates pledging non-ad valorem tax moneys or other revenues of the municipality to secure such certificates or other like obligations and apply the proceeds of such certificates or obligations to make the required contribution to expendable surplus.
Subject to the foregoing discussion, your third question is answered in the negative.
Though not directly involved in response to your inquiry, I would note for your information that s. 627.351, F. S., was amended by Ch. 77-380, Laws of Florida, to require the Department of Insurance to adopt a joint underwriting plan to assist political subdivisions of the state in acquiring casualty insurance coverage. Since municipalities are, in the context and for the purposes of Ch. 77-380, political subdivisions of the state, s.1.01(9), F. S., the city could elect to participate in such a plan as an alternative to the proposal to which your inquiries relate.
Prepared by: Daniel C. Brown Assistant Attorney General