**E.F. HIGGINS, INC.,**
Plaintiff-Respondent,

v.

**KUHLMAN DIE CASTING CO., INC., a Missouri corporation, and Monroe City Tool & Die Co., a Missouri corporation, Defendants-Appellants.**

No. 46302.

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 22, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 12, 1984.

Application to Transfer Denied
Feb. 15, 1984.

Robert J. Campbell, Kansas City, for defendants-appellants.

Michael J. Aubuchon, St. Louis, for plaintiff-respondent.

SMITH, Judge.

Defendants appeal from a judgment against them of $250,000 in a court-tried contract case. We affirm.

Plaintiff was a manufacturer's representative for defendants. The relationship commenced in 1950 and was terminated in 1979.[1] Defendants are in the die-casting business and are closely held corporations whose principal owner is L.O. Kuhlman. In 1950 Kuhlman was in the initial stages of developing his die-casting business. Pursuant to a verbal agreement, E.F. Higgins obtained a die-casting contract for Kuhlman from Killark Electric Company. On October 2, 1950, Kuhlman wrote to Higgins acknowledging receipt of the order and stated:

"We will also pay 5% on billing of die castings on any other business accepted by us as long as accounts transferred to us are serviced by Edward F. Higgins."

In 1950 there were no geographical restrictions on Higgins' activities as a representative for Kuhlman.

In 1954, it was decided by Kuhlman to give Higgins a more restricted territory which would be exclusive to Higgins. On October 16, 1954, a letter setting forth these arrangements was sent by Kuhlman to Higgins. The letter indicated Kuhlman's desire that Higgins contact and work prospective and present customers in the newly defined territory at least once every two months. It further stated:

"We also feel that you should not expect to hold an exclusive agreement with customers within this territory if you fail to call or contact them as well as service their account at least once in any six month period."

On October 23, 1954, Kuhlman again wrote Higgins further refining the agreement between them. Three paragraphs of that letter are of particular importance to this case and are quoted in full:

"It is the purpose and our intent to pay you 5% commission on all Diecasting work developed in this territory by you or the Kuhlman Diecasting Company providing you service the account and it is our intent that you should call upon all accounts in this territory at least once in each 60 day period and that any active account that you do not call on at least once in any 6 month period would be automatically removed as an exclusive account and the Kuhlman Diecasting Company would only be obligated to pay commission on work developed previously by you leaving the Kuhlman Diecasting Company free and without obligation to you to work and service that account without commission to you.

"It is the purpose of this letter that it becomes an instrument of agreement between Kuhlman Diecasting Company and Edward F. Higgins as a representative or agent to represent the Kuhlman Diecasting Company in this territory.

"All previous letters and agreements now becoming null and void with the authorization of the exclusive territory. We of course will continue to pay commission as previously paid for any work previously developed in or out of this territory. New work developed by the Kuhlman Diecasting Company pertaining only to new parts of any account previously serviced by Edward F. Higgins will not be included in this agreement if they are out of this territory."

1. Originally plaintiff operated as an individual, E.F. Higgins, but thereafter incorporated. No question is raised that the incorporation affected the relationship between plaintiff and defendants.

In response to this letter, Higgins raised a question concerning commissions for orders previously developed from the Dexter Company, outside his new geographical territory, which he would not be servicing. In response to that inquiry, Kuhlman wrote Higgins on November 2, 1954, and included the following statement:

"In recognition of our new agreement we wish to include the following statement. We intend to continue paying commission to you for present accounts with Dexter Company."

There was considerable testimony that the die-casting business presents a different situation than is normally found in the usual manufacturer-customer relationship. Once an order is placed for die casts the customer incurs substantial initial expense to the die caster for the tooling necessary to make the castings. As a result of this heavy initial expense, it is not economically sound for the customer to change die casters for reorders of the same castings even though he may change to a different die caster for new orders of different castings. An initial order for die castings becomes self-perpetuating for reorders and these reorders may continue for decades.

Defendants terminated Higgins as their manufacturer's representative in 1979. Higgins sought by this suit to recover the commissions on reorders of castings for ten years after the termination in 1979.

After the termination, defendants paid to Higgins commissions for reorders billed six months after the date of termination. The award of damages to Higgins for breach of contract was less than the reorder commissions which would have been due for orders billed prior to trial even after deducting the commissions paid during the six-month post-termination period. Plaintiff has not appealed from the damage award.

Plaintiff does not challenge the right of defendants to terminate its contract as a manufacturer's representative. Nor does it make any claim for commissions for new business from customers that it had serviced prior to termination. It sought in this action the commissions for reorders of cast-

ings from customers serviced by it when the original orders were developed.

■ Defendants' first point is that the trial court erred in failing to conclude that contracts between a manufacturer and its representative which do not contain a fixed period of duration are terminable at will. While we cannot conclude that the trial court failed to make such a finding, the point is irrelevant. Plaintiff is not seeking damages for wrongful termination; it is seeking damages because, after termination, defendants did not pay it commissions to which it contends it is contractually entitled.

Defendants' next two points go to that issue. The thrust of defendants' argument in that regard is that plaintiff was entitled to residual commissions only while it was servicing the customers. Upon termination of its contract, plaintiff was no longer servicing the customers and its right to commissions ended. The defendants contend that the "servicing" requirement was specifically referred to in the October 2, 1950, letter and this requirement was incorporated by reference in the subsequent correspondence. Plaintiff contends that the series of letters forming the contract and other oral agreements establish its right to residual commissions. It further contends that "servicing" as used in the 1950 letter contemplated predominately the obtaining of new orders. There was testimony to support each party's view of the meaning of the term "servicing."

■ Much of defendants' argument centers around the cases of *Entis v. Atlantic Wire & Cable Corporation,* 335 F.2d 759 (2d Cir.1964), *Baum Associates, Inc. v. Society Brand Hat Company,* 340 F.Supp. 1158 (E.D.Mo.1972) and *Baum Associates, Inc. v. Society Brand Hat Company,* 477 F.2d 255 (8th Cir.1973). In essence, those cases discuss the difference in rights of a manufacturer's representative with servicing responsibilities and a "finder" whose only obligation is to find the business. Generally speaking in the former case the right to commissions terminates upon termination

of the representation contract. In the latter, the right to commissions continues thereafter because the finder's only obligation in order to receive commissions is satisfied when he finds the business. It is at least arguable that the nature of plaintiff's representation here more nearly approximated that of a "finder" than of a true manufacturer's representative at least as it related to reorders of previously ordered castings. But we need not decide that issue. Nothing in *Entis* or the *Baum* cases prevents the parties from contracting as they see fit regarding residual commissions regardless of whether the relationship is one of true manufacturer's representative or finder. We look then to the agreement between the parties.

Our review is that prescribed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) [1–3]. The cardinal rule for construction of a contract is an ascertainment of the intention of the parties from the document or documents comprising the contract and the surrounding circumstances and conditions. We consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding circumstances and facts leading up to and attending the execution of the contract and the apparent purpose the parties were undertaking to accomplish. *Eatherton v. Moore*, 636 S.W.2d 349 (Mo.App.1982) [2]. The interpretation of the contract by the parties, particularly at the time of its execution, may be considered as an aid to its interpretation. *Veatch v. Black*, 363 Mo. 190, 250 S.W.2d 501 (1952) [2, 3]. The intentions of the parties here are to be gleaned from the series of letters between them; there is not one fully integrated document.

We first note that the October 23, 1954, letter expressly states that all previous letters and agreements are "null and void." This would presumably include the 1950 letter with its servicing language. These earlier letters are an aid, however, in determining the intention of the parties. We also note that the 1954 correspondence effected a substantial change in the circumstances under which Higgins was to receive commissions. Prior to that time, Higgins had an unlimited territory and his commissions were limited to those accounts which he procured. It is in this sense that the term "serviced" was used in the 1950 letter. In 1954 Higgins was limited to a fixed geographic territory in which he had an exclusive interest. He was entitled to commissions on all business generated from that territory (with the exception of certain individually specified orders or accounts reflecting preexisting orders) whether he was responsible for defendants' obtaining the business or not. The defendants, however, agreed to pay commissions for "work previously developed in or out of this territory" by Higgins but not for "new parts of any account previously serviced by Edward F. Higgins ... if they are out of this territory." This language can have no other meaning than a recognition that reorders by accounts no longer to be serviced by Higgins would nevertheless entitle him to commissions.

The October 23, 1954, letter further addressed the "servicing" aspect of Higgins' new representation. It provided that if Higgins failed to call upon an account for six months he would lose his exclusive right to commissions on that account, leaving defendants only "obligated to pay commission on work developed previously by you ...." This again reflects that Higgins' servicing obligation pertained to his right to commissions for new work within his exclusive territory but did not affect his right to commissions for casting work developed by him prior to his failure to service. It was essentially an incentive provision designed to keep Higgins working the territory for new business while recognizing his right to commissions for business previously generated. That this was the intention of the parties is further supported by the defendants' acknowledgment of their obligation to pay Higgins for the "present accounts with Dexter Company" which Higgins would no longer be servicing. The letters make clear that the parties differentiated between reorders of castings and new orders from prior customers. This is fully consistent with the nature of the business where an

**322**

initial order of castings might generate reorders for a long period of time when the customer needs to resupply.

■ There was additionally much oral testimony by Higgins of statements by Kuhlman during the term of the contract of an obligation to pay commissions for reorders for work originally developed by Higgins. Toward the end of the relationship, Kuhlman also made an offer to buy the plaintiff for $265,000. The defendants were the only companies represented by plaintiff at the time, they were its only source of income, and the Higgins Company had no assets of consequence other than its right to commissions from defendants. Considering these facts and the undisputed right of defendants to terminate the contract at any time, this offer reflects Kuhlman's belief at that time that plaintiff was entitled to residuary commissions for reorders of work previously developed. The trial court found the intention of the parties under the contract to be a right by plaintiff to receive these residuary commissions whether it serviced the customers or not and even after termination. The letters between the parties and their conduct under the contract fully support this finding both in fact and in law.

■ Defendants' final point involves the amount of damages. They contend that plaintiff was entitled to the net amount it would have received under the contract. This they assert is the amount of gross commissions less the expenses necessary to service the accounts, citing *Dingman v. Elizabeth Arden Sales Corp.,* 284 S.W.2d 16 (Mo.App.1955) and *Rich v. Eastman Kodak Company,* 583 F.2d 435 (8th Cir.1978). That amount would be less than the commissions paid by defendants after termination. Our holding that the contract required payment of residual commissions without regard to servicing by the plaintiff disposes of this contention. Plaintiff fulfilled its obligation under the contract when it developed the original orders. It had no other obligation to perform in order to receive the commissions and was entitled to those commissions in full after termination of the agreement.

*Dingman, supra,* involved loss of commissions following wrongful termination and, therefore, plaintiff's damages were determined by the potential commissions to be earned less the cost of earning them had the employment continued. Here there was no earning to be done. *Rich, supra,* involved a claim for lost profits which inherently requires a deduction of expenses. We find both cases distinguishable.

We deny plaintiff's separately filed motion to dismiss the appeal.

Judgment affirmed.

GAERTNER, P.J., and STEPHAN, J., concur.