**LODGE OF THE OZARKS, INC., a Missouri Corporation, Plaintiff–Appellant,**

v.

**CITY OF BRANSON, Defendant–Respondent.**

No. 16248.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 9, 1990.

John H. Schmidt, Harvey S. Allen, Schmidt, Kirby & Sullivan, P.C., Springfield, for plaintiff-appellant.

M. Sean McGinnis, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendant-respondent.

FLANIGAN, Chief Judge.

Plaintiff, Lodge of the Ozarks, Inc., ("the lodge"), a Missouri corporation, brought this declaratory judgment action against defendant, City of Branson, a city of the fourth class. The principal matter in dispute is whether the lodge must pay the city two fees to obtain issuance of a building permit. The disputed fees are a capacity fee of $94,185 in order to have access to the city's sanitary sewer system, and a building permit fee of $29,750.

The parties submitted to the trial court a stipulation of facts, and there is no significant factual dispute.

In January 1982, the city, as lessor, and the lodge, as lessee, entered into a lease involving a portion of a 120–acre tract owned by the city. The land was located outside the city limits and was known as the "old Branson Airport." The original term of the lease was 30 years, commencing July 15, 1982. The lease obligated the lodge to construct a dinner theater on the leased premises. The lodge was also required to construct, at an unnamed later time, a "hotel complex." Other provisions of the lease will be stated later.

In 1983 the lodge built the dinner theater and also built a sewage treatment plant to service the theater. In April 1984 the city annexed the leased land. In 1985, pursuant to council action and a city election, the city enacted Ordinance No. 673.

In November 1987 the lodge applied for a building permit in connection with the construction of the hotel complex which had an estimated value of $6,936,363. Under Ordinance 673, in order for the lodge to receive a building permit, it had to pay the two disputed fees. Under the prior ordinance, Ordinance 543, in effect at the time the lease was executed and superseded by Ordinance 673, the building permit fee would have amounted to $6,936.36 and there would have been no capacity fee. By agreement of the parties, the building permit was issued, but payment of the disputed items was deferred until the parties' respective rights were determined in this proceeding.

The trial court, after hearing evidence in addition to the stipulated facts,[1] found the issues generally in favor of the city and entered judgment to the effect that the

---

1. Among the facts stipulated were the following:

1. Ordinance 673 increased the building permit fee from $1.00 to $4.25 per $1,000 of cost of construction. "Ordinance 673 concerning the building permit fee was enacted for the purpose of recovering from developers the cost of [the city] for the inspection and enforcement of [the city's] national building codes. The portion of Ordinance 673 concerning the building permit fee was intended by [the city] to have been a regulatory measure and an exercise of [the city's] police power."

2. Ordinance 673 "requires all new construction within [the city's] limits to pay at the time of application for a building permit a one-time capacity fee charge for the capacity that the new construction would require in a present or future treatment plant and the purpose of this portion of said ordinance is to raise additional revenues to help build a new waste water treatment plant. The amount of the capacity fee to be paid by commercial establishments, including [the lodge], is based upon the estimated daily sewage flow while the amount to be charged to residential property is set at a flat rate per residential unit."

3. On November 24, 1986, the city enacted Ordinance 719 "which states sewer rate charges to be paid by users of [the city's] sewer system.... [The lodge] has, since the enactment of Ordinance 719, paid to [the city] the monthly sewer rate charges as set out in said ordinance."

provisions of the lease did not excuse the lodge from payment of the disputed fees. The court also found that the portions of Ordinance 673 increasing the building permit fee beyond that prescribed by the predecessor ordinance, and creating the capacity fee, were neither illegal nor unconstitutional. The court, relying upon a provision in the lease, awarded the city an attorney's fee of $1,000. The lodge appeals.

In general, the lodge contends that to be entitled to issuance of the building permit for the hotel complex it is obligated to pay only $6,936.36, the building permit fee prescribed by Ordinance 543, rather than the building permit fee of $29,750 prescribed by Ordinance 673, and that it has no liability to pay the capacity fee prescribed by Ordinance 673 because: (a) under the lease, the city had a duty to provide the lodge access to the city sanitary sewer system at the city's sole cost; and (b) Ordinance 673, in increasing the building permit fee and in creating the capacity fee, is illegal and unconstitutional because it impairs the obligations of the lease, and prescribes a building permit fee which is so excessive as to be unreasonable. The lodge also contends that the trial court erred in awarding the city $1,000 as attorney's fees and in not awarding attorney's fees to the lodge.

For the reasons which follow, this court holds that the lodge was not required, by reason of the lease, to pay the capacity fee prescribed by Ordinance 673 but is required to pay the building permit fee prescribed by that ordinance. The two fees will be separately discussed.

### The Capacity Fee

The lodge's first point is that the lease obligated the city to provide sanitary sewers for the leased premises at the city's sole cost and that the trial court erred in ruling otherwise. The lodge also contends that the "uncontradicted testimony" of its president, James Thomas, concerning matters occurring prior to the execution of the lease shows that the city had that obligation.

Thomas testified that the construction of the dinner theater commenced after the lease was executed and was completed in 1983. The lodge built a treatment plant in accordance with federal and state specifications. Since the leased land was then outside the city, there were no city specifications. The treatment plant, which cost $60,000, was built at the same time the dinner theater was constructed. The capacity of the treatment plant was sufficient to serve "the full development," that is, the dinner theater and the contemplated hotel complex, because it was not certain that the land would be annexed to the city.

In March 1986 the city, following annexation, put in its main sewer line along Gretna Road near the leased land and then installed a sewer across the leased premises to the dinner theater. Thomas said the city "put an adequate line of their own up to the plant." The lodge then dismantled and removed its treatment plant.

In November 1987, two years after the enactment of Ordinance 673, the lodge applied for a building permit and the city then sought to impose the two disputed fees.

Thomas also testified that he understood that the two disputed items were being charged in connection with the hotel complex, including the hotel which has 191 units, and that the disputed items had "nothing whatever to do with the dinner theater" which was built before annexation.

The lodge's first point requires consideration of the language in the lease in light of legal principles pertaining to a contract entered into between a city and another party, constitutional provisions against the impairment of contracts, the city's exercise of its police power, and the allocation of costs as a part of that exercise.

■ "No ... city ... shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law; ... and such contract, including the consideration, shall be in writing...." § 432.070 RSMo 1986. The provisions of § 432.070 are mandatory and not merely directory. *Needles v. Kansas City*, 371 S.W.2d 300, 306[5] (Mo.1963). Neither

side challenges the legality of the lease or the authority of the city to enter into it.

"[C]ontracts made by the city, if authorized, are just like other contracts. They are measured by the same tests and subject to the same rights and liabilities." *State v. Kansas City,* 319 Mo. 386, 4 S.W.2d 427, 431[10] (banc 1928). "Provided they are of a kind municipal corporations can legally make, cities are bound by their own contracts in the same manner and to the same extent that natural persons and private corporations are bound by their agreements. 5 McQuillin, Municipal Corporations (1969 Rev.Ed.), § 19.39, p. 498." *Logue v. City of Carthage,* 612 S.W.2d 148, 150[4] (Mo.App.1981).

In *North Kansas City Sch. D. v. J.A. Peterson–Renner, Inc.,* 369 S.W.2d 159, 165 (Mo.1963), the court said:

"The supervision and regulation of sewers is a police function of the city. Therefore, in granting permission for the use of the sewers in the first instance and for the continued use thereof, the city must at all times retain control, and any attempt by way of contract to deprive the city of that control is void. The police power of the city cannot be bargained away by contract but must at all times be available for use to meet such public needs as may arise."

 Providing for sewerage is a governmental function and an exercise of the police power of the state. *State v. Metropolitan St. Louis Sewer Dist.,* 365 Mo. 1, 275 S.W.2d 225, 230[5] (banc 1955). To similar effect see *State ex rel. City of Grover v. Gee,* 573 S.W.2d 107, 108[1] (Mo. App.1978). A city cannot surrender or contract away its governmental functions and powers. *Stewart v. City of Springfield,* 350 Mo. 234, 165 S.W.2d 626, 629 (Mo.1942). A city has no power to hamper the free exercise of its legislative discretion and the authority to establish and locate sewers and to provide plans for their construction is legislative. *Id.*

In *State ex rel. Kansas City v. Public Service Com'n,* 524 S.W.2d 855 (Mo. banc 1975), the court discussed extensively the interplay of principles dealing with a municipal contract, the exercise of police power, state and federal constitutional provisions against impairment of contracts, and the issue of the limit to which allocation of cost is an inseparable part of police power. That case involved a contract between a railroad and the city of Kansas City, entered into in 1909, requiring the railroad to bear the cost of building and maintaining viaducts over its tracks in the city. In 1972 the Public Service Commission, pursuant to a statute enacted in 1963, by order attempted to apportion to the city 90 percent of the cost of viaduct repairs, with the remaining 10 percent to be paid by the railroad.

The issue was whether apportionment of the cost by the Public Service Commission "was so inseparably a part of the commission's action under the police power that its exercise necessarily had the effect of abrogating" the 1909 contract between the railroad and the city.

The court, at 524 S.W.2d 859, recognized the general rule that abrogation of a contract or rights thereunder as a result of proper exercise of the police power does not violate state or federal constitutional provisions[2] against impairment of contracts because the police power "may not be hindered or frustrated by contracts between individuals or companies or governmental subdivisions." The court said, at 864:

"[S]ince the parties previously had entered into a valid and binding contract whereby they spelled out how the costs of such improvements should be borne and *since there has been no showing that enforcing those rights will frustrate or hinder the state's police power or the achievement of its objective,* the state's police power should not be held to abrogate [the railroad's] obligation to pay for the improvements involved here-

**2.** "[N]o law impairing the obligation of contracts ... can be enacted." Art. I, § 13, Mo. Const.

"No state shall ... pass any ... law impairing the obligation of contracts." Art. I, § 10, U.S. Const.

in under said prior contractual arrangement." (Emphasis added.)

The court said, at 861:

"We have decided that when a state or city properly directs that something be done in order to protect the public health or safety, it does not necessarily or universally follow that allocation of the costs thereof is such an inseparable part of that exercise of the police power that it automatically overrides and abrogates agreements of the parties as to how such expenses are to be borne."

The court said, at 864:

"We hold that when the state appropriately directs that work be done in order to protect the public health or safety, the police power of the state includes the right to direct payment for the work ordered to the extent necessary to the achievement of the objectives for which the police power is being exercised, even if the result is to infringe on existing contractual rights, *but that beyond that necessity, allocation of such costs is not an inseparable part of the police power. A determination that denial of the right of the state or city or its agency to allocate costs will frustrate or hinder enforcement of the police power and achievement of its objective is necessary as a condition to abrogating existing contractual rights.*" (Emphasis added.)

The impairment, that is the attempted change, of the contract would have reduced the contractual rights of the city. The same result would have been reached if the impairment would have increased the city's contractual rights. In *Missouri, K. & T. Ry. v. Oklahoma,* 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957 (1926), one of the authorities relied upon by the Missouri Supreme Court in *State ex rel. Kansas City v. Public Service Com'n, supra,* the city of McAlester, Oklahoma, entered into a contract with a railroad providing that if the city opened a street across the railroad's right-of-way the city would bear the expenses thereof. This provision was held valid as not inconsistent with the city's proper exercise of its police power and an order of the Oklahoma Corporation Commission requir-

ing the railroad to assume a portion of such expenses was held to be invalid as impairing the obligation of the contract.

*State ex rel. Kansas City v. Public Service Com'n, supra,* involved the effect of the exercise of police power by the state upon a municipal contract. The constitutional protection against impairment was afforded the contract under the circumstances there. If the city itself had impaired its own contract by attempting unilaterally and by subsequent ordinance to allocate the cost of viaduct erection and maintenance, the same protection would have been afforded. *The State ex rel. City of Kansas City v. The Corrigan Street Ry. Co.,* 85 Mo. 263 (1884); see also *City of Independence v. Independence Water Works Co.,* 153 Mo.App. 693, 135 S.W. 956 (1911).

In *The State ex rel. City of Kansas City v. The Corrigan Street Ry. Co.,* by ordinance enacted in 1869, the city contracted with a railway company for the latter to keep in good repair certain portions of a street near the railroad track. By an ordinance enacted in 1884, the city sought to impose a new and different obligation upon the railway company, an obligation greater than the one the railway company had assumed in 1869. The court recognized the general principle that the police power of the city could not be bargained away but said that that principle had no application. The court said that if the 1869 contract had provided that the city would not regulate the speed of the railway cars or the number of hours they would operate, the principle against bartering away the police power of the city would apply. The city had power, however, to permit the railroad to operate upon its streets and could not, under the pretense of exercising its police power in 1884, increase the railroad's obligation.

■ The lease provisions upon which the lodge relies in support of its first point are found in Paragraph 8. The city in its response to that point relies on Paragraphs 4

and 7. The three paragraphs are set forth below.[3]

The lodge bases its challenge to the capacity fee primarily on this language in paragraph 8: "[The city] shall provide sanitary sewers for leased premises as soon as possible after annexation but shall have no obligation for such sewer services prior to annexation."

The lodge argues: the quoted language places an obligation on the city to provide a sewage system for the disposal of the sewage produced on the leased premises at no cost to the lodge other than monthly sewer charges which are the type mentioned in paragraph 7; the requirement that the city provide "sanitary sewers" means that costs incident to so providing must be borne by the city; the obligation of the city was to furnish sanitary sewers "for [the] leased premises" and the lease contemplates the construction of the hotel complex as well as the dinner theater; the imposition of the capacity fee would violate the lease by placing a portion of the costs of the city's sewage system upon the lodge; the city's duty to provide sanitary sewers includes sewers equipped with adequate treatment facilities; the lodge would have continued to operate its own treatment plant if the city had not provided for the treatment of the lodge's sewage.

With respect to paragraph 4 of the lease, the lodge argues: paragraph 4 refers only to ordinances concerning the manner in which improvements or alterations are made and not to ordinances concerning fees; the second paragraph of paragraph 4

3. "4. (*Possession and Use*) [The lodge] shall have possession of leased premises beginning January 15, 1982, and shall use said premises for the development of a dinner-theater and hotel complex and convention center as hereinabove described and set out. It is understood and agreed that all buildings upon the leased premises shall be set back and located and constructed in such manner as to comply with all existing ordinances of [the city], and shall not conflict with existing leases, including the White Water lease, the Hee–Haw lease, and the Wal–Mart lease.

"If possible, the dinner-theater as hereinabove described shall be operational as of July 1, 1983. [The lodge] covenants that any such improvements and alterations shall be made in a workmanlike manner and in compliance with all applicable federal, state, and municipal laws and regulations, as well as all building codes, fire codes, and ordinances of [the city], and not in conflict with existing leases heretofore entered into by and between [the city] and other lessees on the Old Branson Airport property."

. . . . . .

"7. (*To Pay Light, Power, Gas, Water, Telephone, Fuel and Sewer Rate and Charges*). That [the lodge] shall promptly pay, in addition to the rent above specified, all electric light, power, gas, water, telephone, fuel and sewer rates or charges levied or charged during the term of this lease for electric lights, power, gas, water, telephone, fuel and sewer service used in and for the above described premises, and in case any of such rates or charges shall not be so paid when due, then [the city] may pay the same and the amount so paid will be due and payable by [the lodge] immediately and if not immediately paid, [the city] shall have all the rights herein set forth as if default in one of the covenants had been made.

"[The city] and [the lodge] agree that all utilities installed upon leased premises and the remainder of the Old Branson Airport property shall be installed underground."

"8. (*Sewage Systems*) While [the city] is limited to the services it can provide leased premises prior to annexation, [the city] agrees to extend to [the lodge] such city services permitted by law which would be, in the judgment of the Board of Aldermen of [the city], mutually beneficial to [the city] and [the lodge]. [The city] shall provide sanitary sewers for leased premises as soon as possible after annexation but shall have no obligation for such sewer services prior to annexation. [The lodge] shall obtain all necessary permits and approval required for the disposal system installed by [the lodge] at [the lodge's] expense prior to the time the aforesaid sanitary sewers connected to [the city's] city sewer system become available after annexation, and shall maintain said system in proper working order.

"Until such time as [the lodge] shall be served by sewers connected with [the city's] city sewer system, [the lodge] is hereby granted the right and necessary easements upon and across [the city's] land adjacent to and north of leased premises upon which to construct and maintain a sewer disposal system at [the lodge's] cost and expense to serve leased premises. Such sewage disposal system shall be located to provide gravity flow from leased premises to the disposal system and from there into Roark Valley, maintain the beauty and enjoyment of both leased premises and the remainder of the Old Branson Airport property, and interfere as little as possible with the future development of all of the Old Branson Airport property. The site for said sewer disposal system shall be agreed upon by [the city's] City Manager and [the lodge's] President."

refers only to the dinner theater and makes no reference to the hotel complex.

The city argues:

"Paragraph 8 specifically notes that the City is limited in the services it can provide [the lodge] prior to annexation. The City then specifically agrees to 'provide' sanitary sewers to the leased premises as soon as possible after annexation, but with no obligation for such services prior to annexation. Recognizing that there was no access to any sewage disposal system on the leased premises at the time this contract was made, it is clear that this provision only addresses who is to be responsible for providing sewage disposal prior to City annexation. This paragraph clearly requires [the lodge] to establish a sewage system prior to annexation, in light of the inability of the City to make the leased premises a part of its sewage treatment system. This lease provision simply states that the City will provide a service that it provides all residents and businesses within its territorial limits, upon annexation. Considering the undisputed fact that there was no access to the City sewage disposal system prior to annexation, it is clear that the word 'provide' means to provide access to that system, and nothing more. The argument that this term should be broadly construed to require the City to furnish [the lodge] with sewer services, waiving all fees other than the user rate, creates an obligation that is unwarranted by the contractual terminology and attending circumstances."

The city also argues that paragraph 7 of the lease requires the lodge to pay the capacity fee. The city says:

"Of particular importance is [the lodge's] agreement to pay 'all' charges concerning sewer service 'charged during the term of this lease.' This language could not be any clearer, and when construed in light of the nature of this lease, the circumstances surrounding its execution, and the position of the parties to the lease, there could be no doubt but that [the lodge] is obligated for the capacity fee enacted prior to its new construction of the hotel and convention center."

The city also argues that paragraph 4 of the lease requires the lodge, in making "improvements and alterations, to do so in a workmanlike manner and in compliance with all ... municipal laws and regulations, as well as all building codes, fire codes and ordinances." That language, says the city, "would also mandate that any new construction also be performed in compliance with all applicable municipal laws and regulations." The city also argues that the lease, which was drawn by the city attorney, "is not ambiguous."

"The cardinal rule for construction of a contract is an ascertainment of the intention of the parties from the document or documents comprising the contract and the surrounding circumstances and conditions. We consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding circumstances and facts leading up to and attending the execution of the contract and the apparent purpose the parties were undertaking to accomplish."

*E.F. Higgins, Inc. v. Kuhlman Die,* 663 S.W.2d 318, 321 (Mo.App.1983).

In construing an unambiguous contract, "[t]he courts seek to ascertain the intent of the parties by giving to the language used its natural, ordinary and common sense meaning, but they also look to the entire contract; and the court should consider the object, nature and purpose of the agreement." *Wilshire Const. Co. v. Union Elec. Co.,* 463 S.W.2d 903, 906[3] (Mo.1971).

Paragraph 4 of the lease does not mention sanitary sewers. Paragraph 7 of the lease mentions "sewer rates or charges" and deals with the right of the city to pay same in the event the lodge fails to do so. The capacity fee did not come into existence until 1985 when Ordinance 673 was enacted. Monthly sewer rates and charges, the type which paragraph 7 of the lease addresses, are the subject of a separate ordinance, Ordinance 719, which repealed prior ordinances dealing therewith.

Only the second sentence of paragraph 8 deals specifically with "sanitary sewers for [the] leased premises," and it requires that the city "provide" such sewers as soon as possible after annexation.

In placing the duty on the city to provide sanitary sewers, the lease implicitly imposes upon the city the burden of the costs incurred in so providing. An adequate treatment plant is an integral part of a sanitary sewerage system. A sanitary sewer is of no value to the premises which it is intended to service unless it rids the premises of sewage. Obviously this requires that the sanitary sewer be hooked up to the facilities of the premises where such sewage is to be discharged. If there is no hook-up with the sanitary sewers, the leased premises derive no benefit from the mere existence of those sewers.

The city's position is that the hook-up will be provided only if the lodge pays the capacity fee. This position is inconsistent with the duty imposed upon the city by the lease. On this record the unqualified contractual duty on the part of the city to provide sanitary sewers cannot properly be conditioned upon a payment by the lodge of the capacity fee imposed by a subsequent ordinance.

The capacity fee amounts to $94,195. The city administrator testified that the construction cost of the sewage treatment plant, the financing of which was effectuated by Ordinance 673, was approximately $5,000,000. The capacity fee sought to be imposed on the lodge is a very small portion of that amount.

This court agrees with the lodge that paragraph 8 of the lease imposes on the city the duty to provide the lodge with sanitary sewers at no expense to the lodge. This court also holds that Ordinance 673, insofar as it seeks to impose upon the lodge a duty to pay the capacity fee, impairs the rights of the lodge under the lease. The city adduced no witness or evidence to the effect that the contractual elimination of any duty on the part of the lodge to pay the capacity fee would "frustrate or hinder enforcement of the police power and achievement of its objective." *State ex rel.*

*Kansas City v. Public Service Com'n, supra.* Indeed, the treatment plant of the city has been in operation since 1988.

This court holds that the lodge is not obligated to pay the capacity fee and that the city could not properly condition the issuance of the building permit upon such payment.

### The Building Permit Fee

The lodge asserts that in order to obtain the building permit for the hotel complex it was obligated to pay only $6,936.36, the building permit fee prescribed by Ordinance 543, rather than the building permit fee of $29,750 as prescribed by Ordinance 673 because: (a) at the time the lease was entered into in 1982, Ordinance 543 was in effect and "the lease provides which ordinances the lodge was obligated to comply with, that is, those ordinances in effect when the lease was executed"; Ordinance 673, in increasing the building permit fee, violates Art. I, § 13 of the Missouri Constitution forbidding the enactment of laws impairing the obligation of contracts; (b) the building permit fee charged by the city under Ordinance 673 "is so excessive as to be unreasonable and an invalid exercise of the city's police power."

In advancing prong (a) of its challenge to the building permit fee, the lodge argues that the fee prescribed by Ordinance 543, which was in effect when the lease was executed, is the only fee which the city may properly charge and that the increase in that fee, effected by the enactment of Ordinance 673, is improper. The lodge does not claim that paragraph 4 of the lease, set forth in footnote 3, limits the permissible fee to that prescribed by Ordinance 543. It is the position of the lodge that paragraph 4 of the lease does not involve building permit fees, although the city disagrees with that position.

■ The lodge makes no claim that there is an *express* provision in the lease to the effect that the city would not increase building permit fees. The lodge seeks to *imply* such a provision in the lease by invoking the general principle, enunciated

in *Sharp v. Interstate Motor Freight System*, 442 S.W.2d 939, 945 (Mo. banc 1969), that laws which exist at the time and place of making a contract, and at the place where it is to be performed, affecting its validity, construction, enforcement, termination and discharge, enter into and form a part of the contract as if they were expressly referred to or incorporated therein.

Under authorities previously cited, the general rule is that a city cannot contract away its governmental functions and powers. The authority to enact ordinances based upon the exercise of the police power includes the authority to amend them.

*State ex rel. Kansas City v. Public Service Com'n*, discussed earlier in this opinion, permitted an *express* provision in a contract, limited to the matter of allocation of costs, to constitute, in certain circumstances, an exception to the general rule that the police power may not be hindered by contracts between a private person and a governmental subdivision. Here the lodge is attempting to base such a hindrance on an implied provision. In so doing, the lodge seeks to extend too far the holding in *State ex rel. Kansas City v. Public Service Com'n*. The police power may not be bargained away by implication.

■ Assuming, arguendo, that paragraph 4 of the lease does not pertain to building permit fees, which is the lodge's position, this court holds that there is neither an express nor an implied provision in the lease by which the city purported to bind itself not to increase, by subsequent ordinance, the building permit fees authorized under the ordinance existing when the lease was executed. Since there was no such obligation in the contract, Art. I, § 13 of the Missouri Constitution did not come into play. Prong (a) has no merit.

In support of prong (b) of its challenge to the building permit fee, the lodge does not question, and in fact concedes, the city's authority to impose a building permit fee. It complains only about the increase in that

fee effected by Ordinance 673. The total fee under that ordinance is $29,750.[4]

The lodge presented the testimony of many city employees concerning their respective duties with respect to the inspection of the hotel complex. Those witnesses included the city administrator, the building inspector, the director of public works, the city planner, the health inspector and the fire chief. Their testimony is not mentioned in the lodge's brief. Instead, the lodge argues that the fee is unreasonable because building permit fees charged by other cities for "a similar building" would be less. The lodge points to its evidence that the building permit fee charged by the city of Springfield would be $4,143.50, the fee of the city of Hollister would be $6,728.98, and the fee of the city of Osage Beach would be $10,032.

The fee prescribed by Ordinance 673 was, according to the ordinance, charged "in order to recover the cost from the developers for the inspection and enforcement of our national building codes." Evidence was introduced that the city in 1987, by separate ordinances, adopted the Uniform Fire Code, the Uniform Building Code, the Uniform Mechanical Code, and the Uniform Plumbing Code. The city had previously adopted the National Electric Code. The ordinances adopting the various uniform codes incorporated their terms by reference. The codes themselves, consisting of many volumes, were not introduced into evidence.

The city introduced evidence comparing the money collected from building permits and the cost of making building inspections. The following table shows those figures:

| | Building Permit Fees | Inspection Costs |
|---|---|---|
| 1985 | $14,295 | $28,554 |
| 1986 | 56,925 | 36,659 |
| 1987 | 45,490 | 45,646 |
| 1988 | 46,362 | 61,461 |
| 1989 | 34,800 | 75,326 |

■ "An ordinance enacted by the legislative body of a city pursuant to the police power is presumed to be valid." *Home Bldrs. Ass'n, etc. v. City of Kansas*

---

4. Although the estimated construction cost of the hotel complex was $6,936,363, that figure was "rounded off" to $7,000,000 by the city's building inspector, Leo Frazier, and the fee was calculated at $4.25 per $1,000. The lodge makes no complaint concerning the "rounding off."

*City,* 555 S.W.2d 832, 835[4] (Mo. banc 1977). The lodge, as the challenger of the ordinance on the ground of unreasonableness, has the burden of proving unreasonableness. *Id.* The police power is one to be exercised within wide limits of legislative discretion and if an ordinance appears to be within the apparent scope of this power the court will neither inquire into the wisdom of the grant of the power nor substitute its discretion for that of the legislature. *Browning–Ferris Ind. of Kansas City v. Dance,* 671 S.W.2d 801, 811[19] (Mo.App.1984). "[A] court can declare an ordinance unreasonable upon its face by a mere inspection of the ordinance, if upon its face it is unreasonable. This, even in the absence of a special constitutional inhibition." *State v. Remmers,* 340 Mo. 126, 101 S.W.2d 70, 73 (1936).

■ "[T]here is a distinction between the taxing power which is strictly construed against the taxing authority and the police power, to which regulatory fees are justified as incidental to the exercise of the power." *Kansas City v. School Dist. of Kansas City,* 356 Mo. 364, 201 S.W.2d 930, 932 (1947). The city has the right "to collect such fees as are reasonable and incidental to and in reimbursement for the necessary expenses of the regulatory inspections." *Id.*

"The amount of a fee for a building permit should be reasonable and limited in amount to the cost of examination of plans, the issuance of the permit and administration of building regulations.... A building permit fee is generally not considered to constitute a tax. A reasonable charge for a specific service is permissible as a building permit fee, whereas a general fee that amounts to a revenue measure is not." McQuillin Mun Corp § 26.201, (3rd Ed.).

Outstate cases involving challenges to building permit fees on the ground of unreasonableness include *Merrelli v. City of St. Clair Shores,* 355 Mich. 575, 96 N.W.2d 144 (1959); *Daniels v. Point Pleasant,* 23 N.J. 357, 129 A.2d 265 (1957); *Orange and Rockland Utilities v. Town of Clarkstown,* 80 A.D.2d 846, 444 N.Y.S.2d 670 (1981); *Bon Air Estates, Inc. v. Village of Suf-*

*fern,* 32 A.D.2d 921, 302 N.Y.S.2d 304 (1969); *Township of Ridley v. Ridley Arms, Inc.,* 90 Pa.Cmwlth. 143, 494 A.2d 870 (1985); *Raum v. Board of Sup'rs of Tredyffrin Township,* 29 Pa.Cmwlth. 9, 370 A.2d 777 (1977). Those cases hold generally that the amount of the fee may not exceed the cost of issuing the permit and of inspecting and regulating the permitted activity and that a city does not have a power to impose a tax under the guise of a license or permit.

■ Although the permit fee is most substantial, there was testimony from various city employees, all called as witnesses by the lodge, that there would be "ongoing inspections at no charge to the lodge," in order to "inspect and enforce the codes." Since the permit fee was imposed not only for inspection but also enforcement of the building codes, and since the lodge introduced no evidence of the extent to which the latter purpose would be served, nor the cost involved therewith, this court holds that the lodge has failed to sustain its burden of showing unreasonableness of the building permit fee. The fact that three other Missouri cities would have charged less for issuing a building permit does not per se compel a conclusion that the challenged fee is excessive. This court refrains from holding that the challenged fee, although substantial, is on its face unreasonable.

This court holds that the lodge is obligated to pay the building permit fee and that said obligation arose on the date the permit was issued.

The lease contains a provision that the prevailing party, in an action enforce or interpret the terms of the lease, shall be entitled to recover from the other party all reasonable costs, expenses and attorney's fees, the amount of which shall be fixed by the court and made a part of its judgment. The brief of the city takes the position that the provision includes an allowance for attorney's fees and expenses on appeal as well as in the trial court. Although the lodge presented to the trial court evidence concerning its fees and expenses incurred up to date of trial, the trial court made no

assessment of that evidence because it awarded attorney's fees to the city. There is no evidence concerning costs and fees connected with this appeal. The instant record is insufficient to furnish this court a basis upon which to make an appropriate award in favor of the lodge which is now the prevailing party. Remand for that purpose is appropriate.

That portion of the trial court's judgment declaring that the city is not obligated to provide sanitary sewers for the leased premises at the city's sole cost is reversed. That portion of the judgment requiring the lodge to pay the capacity fee is reversed. That portion of the judgment requiring the lodge to pay the building permit fee is affirmed. That portion of the judgment awarding the city an attorney fee of $1,000 is reversed. All other portions of the judgment inconsistent with this opinion are reversed. The cause is remanded with instructions to the trial court to enter, as part of its judgment, an appropriate award to the lodge of reasonable costs, expenses and attorney's fees. The trial court may, in its discretion, receive such additional evidence as it may deem necessary to make such award.

MAUS and SHRUM, JJ., concur.