

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| INDEPENDENT QUALITY<br>FOODS, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | WD82390 |
| | ) | |
| | ) | FILED: October 15, 2019 |
| KANSAS CITY STEAK | ) | |
| COMPANY, LLC, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Justine E. Del Muro, Judge**

**Before Division One: Cynthia L. Martin, P.J., and**
**Victor C. Howard and Alok Ahuja, JJ.**

Independent Quality Foods, LLC ("IQ Foods") sued Kansas City Steak Company, LLC and its owner National Beef Packing Company, LLC (collectively "KC Steak"), alleging that KC Steak had failed to pay IQ Foods commissions it was owed under a contract between the parties. The circuit court granted KC Steak's motion for summary judgment. IQ Foods appeals. We reverse, and remand the case to the circuit court for further proceedings.

### Factual Background

On September 7, 2012, KC Steak's President Ed Scavuzzo and IQ Foods' owner Brandon Lobaugh executed a one-page "marketing/brokerage agreement." Pursuant to the contract, KC Steak would pay IQ Foods commissions on beef

products sold by KC Steak to the restaurant customers listed in the agreement. Specifically, the contract provided:

> We agree to a marketing/brokerage agreement of $.08 on all products for the following customers as of the signed date:
>
> CURRENT
>
> - TGI Friday's
>   - 2013 Top Butts only at $.05 vs. $.08
> - ABRH Holding's [sic] (inclusive to all brands)
>
> IN-PROCESS
>
> - Applebee's
> - Chili's
> - Steakco (Texas Land and Cattle/Lonestar)
> - Ponderosa
> - Sirloin Stockade
>
> . . . .
>
> - This agreement is effective as long as stated customers above are doing business with Kansas City Steak
>
> . . . .
>
> - Payment is contingent upon regular payments to Kansas City Steak Company by listed customers within payment terms
>
> - An addendum to this agreement will be added as new customers are added with stated terms above

In October 2017, IQ Foods filed its one-count petition, which alleged that KC Steak breached the contract by failing and refusing to pay IQ Foods the commissions to which it was entitled under the agreement. KC Steak's answer alleged as an affirmative defense that IQ Foods had failed to provide adequate brokerage services, depriving KC Steak of the benefit of the bargain. KC Steak's answer also asserted the affirmative defense of intervening or superseding cause, contending that KC Steak had no obligation to pay commissions for any customer which had changed its pricing structure.

It is uncontested that IQ Foods never brokered a contract for KC Steak with Applebee's, Chile's, Steakco, or Ponderosa. The dispute between the parties

concerns commissions for sales of beef to ABRH Holdings restaurants in 2016 through 2017, and to Sirloin Stockade in 2014 through 2016.

KC Steak moved for summary judgment, making three principal arguments. First, KC Steak argued that it was entitled to summary judgment because the marketing/brokerage agreement did not contain a specific end date, and was therefore terminable at will. KC Steak alleged that it had terminated the agreement in November 2015. Second, KC Steak contended that it had no obligation to pay IQ Foods commissions for sales to ABRH Holdings after December 31, 2015, because KC Steak and ABRH Holdings had agreed to a changed pricing structure. KC Steak argued that, because payment of commissions under the agreement was "contingent upon regular payments to Kansas City Steak Company by listed customers *within payment terms*," the pricing change absolved KC Steak of its obligation to pay commissions on later sales to ABRH Holdings. Finally, KC Steak argued that it was entitled to judgment as a matter of law with respect to sales to Sirloin Stockade because the parties never executed an addendum adding Sirloin Stockade as a customer for which commissions were owed.

In its response to KC Steak's motion for summary judgment, IQ Foods argued that the agreement provided a specific and definite termination date: when KC Steak ceased doing business with the customers identified in the contract. IQ Foods asserted that its only obligation under the agreement was to broker the relationship between a customer and KC Steak. IQ Foods contended that, once a relationship was established, it had no further obligations under the agreement, and was thereafter due a commission so long as the KC Steak did business with the customer. IQ Foods also alleged that the phrase "within payment terms" referred to the method of payment, and not to the pricing relationship between KC Steak and any customer. Finally, IQ Foods argued that Sirloin Stockade was identified in the contract as an "In-Process" customer, and that no addendum was necessary to add

3

it to the contract. In making these arguments, IQ Foods relied on the express terms of the contract and the affidavit testimony of the contract's signatories – Scavuzzo and Lobaugh – regarding the parties' intentions.

The circuit court entered summary judgment in favor of KC Steak on November 8, 2018. It did not consider the affidavits of Scavuzzo and Lobaugh, because IQ Foods had never argued that the contract was vague or ambiguous. The court determined that the agreement was for an indefinite period of time and was therefore terminable at will. It further found that an addendum was required to add Sirloin Stockade as a customer for which commissions would be due under the agreement. The trial court's judgment did not address KC Steak's argument concerning the change in pricing terms for sales to ABRH Holdings.

This appeal by IQ Foods followed.

**Standard of Review**

Appellate review of the grant of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate if no genuine issues of material fact exist, and the movant is entitled to judgment as a matter of law and. *Id.* at 377. We view the record in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* at 376.

Contract interpretation is a question of law that we review *de novo*. *RLI Ins. Co. v. S. Union Co.*, 341 S.W.3d 821, 831 (Mo. App. W.D. 2011).

**Discussion**

IQ Foods challenges the circuit court's entry of summary judgment in five Points on appeal. It argues that (1) the contract was not too indefinite to enforce because it contained all of the essential elements of a binding, enforceable contract and the parties performed under those terms for over three years; (2) the trial court

4

had an obligation to determine the parties' intent from the affidavits of the contract's signatories; (3) the contract was not terminable at will because it specified an objective and ascertainable "triggering event" for termination; (4) even if the contract was terminable at will, KC Steak would still owe commissions that IQ Foods had already earned by procuring particular customers; and (5) no addendum to the contract was required for Sirloin Stockade because Sirloin Stockade was identified as a customer in the contract. We begin by addressing IQ Foods' fourth Point.

KC Steak's principal argument in support of summary judgment was that it had a right to terminate the contract at will, and that it had exercised that termination right in late 2015. KC Steak's motion presumed that if it had properly terminated the agreement, the termination would completely foreclose IQ Foods' right to further commissions.

KC Steak's summary judgment motion failed to recognize, however, that IQ Foods might have an ongoing right to commissions on KC Steak's sales to customers which IQ Foods had procured, even if the agreement was lawfully terminated at a later time. IQ Foods' right to commissions on post-termination sales depends on what type of commissioned salesperson IQ Foods was under the parties' contract.

> Missouri law differentiates between manufacturer's representatives and finders when determining whether a party is owed post-termination commissions. "A manufacturer's representative with servicing responsibilities loses his right to collect commissions on pre-termination business upon termination." A finder, however, retains the right to commissions on business even after termination. "The rationale behind this distinction is that a finder has completed all of the work that needs to be completed and the right to payment vests upon the finding of business, while a manufacturer's representative has continuing duties to service an account."

*Clemons v. Zimmer Broadcasting Co.*, 159 S.W.3d 508, 511 (Mo. App. S.D. 2005) (quoting *J.S. DeWeese Co. v. Hughes–Treitler Mfg. Corp.*, 881 S.W.2d 638, 644–45

5

(Mo. App. E.D.1994)); *see also*, *e.g.*, *E.F. Higgins, Inc. v. Kuhlman Die Casting Co.*, 663 S.W.2d 318, 320-21 (Mo. App. E.D. 1983). The principle that a "finder" may be entitled to ongoing commissions despite the termination of a contract is grounded in rudimentary contract law. "Where a contractual party has fully performed its obligations under the contract, that party has a vested right to performance by the other party in accordance with the contract's terms." *21 W., Inc. v. Meadowgreen Trails, Inc.*, 913 S.W.2d 858, 879 (Mo. App. E.D. 1995) (citing *Union Pac. R.R. Co. v. Kansas City Transit Co.*, 401 S.W.2d 528, 536 (Mo. App. K.C. Dist. 1966) (addressing whether contract had an indefinite duration and was therefore terminable at will; holding that, regardless, full performance by one party vested a right to performance by the other that cannot be relieved by termination)).

In this case, the parties' brief agreement is identified as a "marketing/brokerage agreement" entitling IQ Foods to "$.08 on all products for the following customers as of the signed date." The agreement further states that "[p]ayment [to IQ Foods] is contingent upon regular payments to Kansas City Steak Company by listed customers within payment terms." But outside these limited statements, the agreement does not expressly impose performance obligations on IQ Foods beyond procuring a customer for KC Steak's products. It is thus unclear (and more importantly given the procedural posture of this case, disputed) whether IQ Foods was required to continue to service the customers it procured in order to earn commissions on ongoing sales.

Although KC Steak was the summary judgment movant, it did not argue that, under the undisputed facts, IQ Foods' right to commissions depended on the existence of a continuing contractual relationship, and that its right to commissions would end once the agreement was (properly) terminated. Instead, KC Steak simply presumed that termination of the agreement would have the effect of

6

terminating IQ Foods' right to commissions. In this respect, KC Steak's summary judgment motion was deficient.

> "The movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment." The trial court is prohibited from granting summary judgment, even if no responsive pleading is filed in opposition to a summary judgment motion, unless the facts and the law support the grant of summary judgment. . . . "[F]or [a movant] to be entitled to summary judgment, the admitted facts must establish its right to judgment as a matter of law."

*Kinnaman-Carson v. Westport Ins. Corp.*, 283 S.W.3d 761, 765 (Mo. banc 2009) (citations omitted). We have frequently reversed grants of summary judgment where, even if all of the movant's contentions were accepted as accurate, they would not entitle the movant to judgment on the non-movant's claims.[1] In a related vein, we have held that a defendant's focus on whether a salesperson's contract was terminable at will was "irrelevant," where the salesperson was arguing that it was entitled to commissions regardless whether its agreement was lawfully terminated. *E.F. Higgins*, 663 S.W.2d at 320 ("Plaintiff is not seeking damages for wrongful termination; it is seeking damages because, after termination, defendants did not pay it commissions to which it contends it is contractually entitled.").

As in *E.F. Higgins*, the issue of whether the contract was terminable at will may become "irrelevant," depending on the nature of IQ Foods' performance

---

[1] *See, e.g.*, *Jobe v. AAA Trailer Servs., Inc.*, 544 S.W.3d 306, 309 (Mo. App. E.D. 2018) (reversing grant of summary judgment to employer concerning enforceability of covenant not to compete, where employer's summary judgment motion failed to address whether it possessed a legitimate business interest to support the covenant); *Beal v. Kansas City S. Ry. Co.*, 527 S.W.3d 883, 887-88 (Mo. App. W.D. 2017) (reversing grant of summary judgment to railroad in crossing accident case where, "even if [the railroad's] summary judgment motion were correct that [the plaintiff] negligently failed to stop at the crossing, [plaintiff]'s negligence—standing alone—would not entitle [the railroad] to a final judgment dismissing her claims" because of comparative negligence principles); *Dilley v. Valentine*, 401 S.W.3d 544, 550-51 (Mo. App. W.D. 2013) (reversing grant of summary judgment to police officer and municipality in case involving injuries to third parties arising out of high-speed police chase, where arguments of officer and municipality only addressed plaintiff's negligence claim, but not plaintiff's separate claim for recklessness).

obligations. Yet KC Steak's summary judgment motion failed to address the actions required for IQ Foods to earn its commissions, even though its right to summary judgment depended on the answer to that question.

The circuit court's grant of summary judgment to KC Steak cannot be sustained on the basis that KC Steak properly terminated the contract. IQ Foods' right to commissions could survive termination, depending upon whether IQ Foods had fully performed, and had a vested right to KC Steak's reciprocal performance, with respect to the customers IQ Foods had procured prior to the purported termination.

KC Steak makes an additional argument in its brief. It argues that, even if the contract was not terminable at will, IQ Foods' right to commissions concerning beef sales to ABRH Holdings terminated when KC Steak renegotiated the pricing structure of its sales to ABRH in 2015. KC Steak contends that this change in pricing structure terminated IQ Foods' right to commissions because the agreement specifies that "[p]ayment is contingent upon regular payments to Kansas City Steak Company by listed customers *within payment terms*." (Emphasis added.)

There are several problems with KC Steak's alternative argument. First, as a factual matter, KC Steak's summary judgment papers failed to establish that in 2015 the overall pricing of KC Steak's sale of beef to ABRH Holdings changed, or if so in what amount. Instead, KC Steak submitted an affidavit which indicated only that KC Steak agreed to lower the "overage" charge for products it sold to ABRH, meaning "the price KC Steak would receive for processing raw meat into individual cut steak products." The "overage" is apparently only one component of KC Steak's pricing, since the overage was in all cases less than $1.33 per pound, which presumably was not the <u>total</u> price KC Steak charged for cuts of meat which included filet mignon and ribeye steaks. Thus, KC Steak's summary judgment evidence failed to show that its 2015 agreement with ABRH Holdings altered the

8

overall price, or overall profitability, of their relationship – it merely showed that one piece of its pricing structure was modified. This is hardly sufficient to establish, as a matter of undisputed fact, that IQ Foods' right to commissions on beef sales to ABRH Holdings was thereby terminated.

In addition, although the agreement provides that IQ Foods' right to payment depended on customers paying KC Steak "within payment terms," the agreement does not state that those "payment terms" must remain forever constant. Moreover, the reference to "payment terms" would normally be read to refer to such matters as the *timing* of payment (including early-payment discounts and late-payment fees), and the *manner* of payment (such as by wire transfer, cashier's check, or by other means of payment). Without further factual development, we are unprepared to hold that the reference to "payment terms" in the agreement meant that IQ Foods' right to commissions depended on KC Steak's *pricing* remaining forever unchanged.

We address one final point. In its fifth point on appeal, IQ Foods argues that it was error for the trial court to conclude that an addendum was required to add Sirloin Stockade as a customer for which commissions were paid under the agreement. We agree.

An addendum was not required to give IQ Foods a right to commissions on KC Steak's sales of beef to Sirloin Stockade. The agreement specified that IQ Foods would be entitled to a commission on all of KC Steak's sales of beef to "the following customers," the "stated customers above," and the "listed customers." The parties' agreement lists customers in two categories: "Current" and "In-Process." The headings distinguishing the two categories use only an adjective; but the noun – "customers" – is obviously implied. Contrary to KC Steak's argument, there is nothing incoherent in referring to both "current customers" and "prospective" or "in-process customers." The agreement's terms plainly apply equally to both "current" and "in-process" customers. While the agreement states that an addendum will be

9

executed "as new customers are added," that provision clearly refers to customers *beyond those identified by name* in the agreement itself. Indeed, if the agreement's listing of "In-Process" customers (including Sirloin Stockade) does <u>not</u> make those customers subject to the existing commission arrangement without a further addendum, it is hard to see what the listing of "In-Process" customers actually accomplishes. Contract "interpretations that render provisions meaningless should be avoided." *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. banc 2017) (citation and internal quotation marks omitted).

## Conclusion

We reverse the judgment of the circuit court, and remand the case to that court for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

All concur.